## HILL AIRCRAFT & LEASING CORPORATION

v.

### FULTON COUNTY, GEORGIA; Sam Brownlee; W.E. Phillips; Hangar One, Inc.

Civ. A. No. C81–1292.

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 30, 1982.

Thomas Wm. Malone, Malone & Percilla, P.C., Albany, Ga., for plaintiff.

Paul Webb, Webb, Daniel & Betts, Atlanta, Ga., for defendants Fulton County, Brownlee and Phillips.

C.B. Rodgers, Phillip S. McKinney, Rodgers & Hardin, Atlanta, Ga., for defendant Hangar One.

## ORDER

ORINDA D. EVANS, District Judge.

This case is before the Court on Motions for Summary Judgment filed by all Defendants. For the reasons set forth, Defendants' Motions are GRANTED.

Plaintiff Hill Aircraft & Leasing Corp. ("Hill") is a fixed base operator at Fulton County Airport ("the Airport"). As such, Hill services, maintains and sells fuel to aircraft using the Airport.

Defendant Hangar One, Inc. ("Hangar One") is the other primary fixed base operator at the Airport. Defendant Fulton County ("Fulton County") owns the land on which the Airport is situated and leases it to various tenants, including Hill and Hangar One. Defendants Brownlee and Phillips are Fulton County officials with administrative responsibilities for the Airport.

This case primarily concerns Fulton County's allocation of space suitable for fixed base operations as between Hill and Hangar One. Hill contends Fulton County has given Hangar One preferential treatment and that this alleged favoritism, coupled with certain other unfair acts of Defendants directed at Hill, has damaged and/or will likely lead to the demise of Hill as a viable business. Hill seeks relief under various legal theories, each of which is discussed in detail below.

From 1956 until 1980, Hill had practically all of the fixed base business at the Airport. Hangar One began attempting to acquire space for a fixed base operation in 1971. Initially, it was not successful. Finally, in 1979, Hangar One succeeded in acquiring the stock or assets of various entities which held leases on airport space suitable for use by a fixed base operator.[1] Fulton County did approve the assignment of these leases to Hangar One and ultimately, in April 1981 these various leases were consolidated into one lease between Fulton County and Hangar One. Hangar One's space at the Airport is now roughly equivalent to Hill's in size. However, Hill complains that Hangar One has space on both sides of Hill's position. Hill contends it should have been given an opportunity to bid competitively on the space leased to Hangar One.

Although there is no evidence in the record that Fulton County actively courted Hangar One to seek space at the Airport, it is clear that this eventuality was compatible with the mutually expressed desires of City of Atlanta and Fulton County officials, who desired to attract general aviation[2] traffic away from Hartsfield Airport and to Fulton County Airport. In order to do that, Fulton County needed additional runway space and additional fixed base operators at its Airport.

Apparently Fulton County Airport has been designated as a "reliever airport" by the Secretary of Transportation under the Airport and Airway Development Act of 1970. One of the consequences of such designation is that Fulton County Airport has received and will in the future receive federal funding assistance.

Defendant Hangar One presently conducts fixed base operations at Fulton County Airport, and at eleven other airports.

Since Hangar One has been operating at the Airport, Hill's share of fuel, maintenance and repair sales has declined. In 1979, Hill received 92% of the maintenance and repair sales revenues at the Airport; for the first two months of 1982, it had 63%. Similarly, in 1979, Hill had 92% of the storage and tiedown services revenues at the Airport. For the first two months of 1982, it had 68% of such revenues. According to Hill's President, Guy Hill, the net worth of

---

1. These entities were Mobley Aviation, Inc.; Accelerated Ground School; and Fulton Air Service.

2. "General aviation" refers to non-commercial aviation.

the corporation has declined dramatically since Hangar One began operations at the Airport.

Hill also contends that Fulton County has given Hangar One preferred treatment in making a $10,000,000 bond commitment to it through the Fulton County Bond Authority for construction of facilities at the Airport. The fact of this commitment is not disputed. However, Hangar One points out that in 1972 and 1973 Fulton County constructed hangars which were leased to Hill at cost plus 7% interest amortized over thirty years. Also in 1978 and 1981 Fulton County constructed additional facilities which it leased to Hill for thirty years on the basis of cost plus 8%. These facilities constructed for Hill entailed initial outlays of approximately $1,250,000 by Fulton County.

Finally, Hill complains of miscellaneous other instances of unfair treatment. The first pertains to a parcel at the Airport previously leased to Fulton Air Service. This parcel, which is presently leased by Hangar One, adjoins a parcel leased by Hill. Hill contends the property lines overlap. Hill's lease predates Hangar One's lease. Hill claims Fulton County's subsequent lease of the FAS parcel to Hangar One constitutes an unlawful taking of Hill's property, to the extent of any overlap, and evidences an equal protection violation.

Another claim relates to a so-called "tank farm" or fuel storage facility at the Airport. The storage tanks, which are physically situated underground, were purchased by Hill from their original owner, Texaco. However, at the time of purchase Hill did not buy the land. Instead Hill made an informal arrangement with the lessee of the land for access to the tanks. Subsequently, Hangar One acquired the stock of the lessee. This land is now included in the consolidated lease between Hangar One and Fulton County referred to above. At the time Fulton County approved Hangar One's acquisition of the land, it assured Hill that its interest in the tanks would be protected. Hill's argument appears to be that Fulton County's lease of the property to Hangar One violates due process and equal protection guarantees.

To date, Hangar One has not taken any action to deprive Plaintiff of the use of the strip of land which allegedly has been "double leased" or access to the tank farm.

Hill complains of Fulton County's lease of various parcels at the Airport without using a competitive bid process. These include: Hangar One's option to lease lots 5 and 6, and the lease of three separate parcels to Coca-Cola, Cox Enterprises, Inc., and Hill-Willford, Inc., respectively.

I. *Claims Arising Under Federal Aviation Statutes*

Plaintiff asserts claims under 49 U.S.C. § 1718 of the Airport and Airway Development Act of 1970 (as amended, 1976) and 49 U.S.C. § 1349(a) of the Federal Aviation Act of 1958.

The Airport and Airway Development Act provides in part that prior to approving a request for airport improvement funds, the Secretary of Transportation must receive assurances that fixed-base operators using the airport will not be subjected to unjust discrimination. Plaintiff contends that Fulton County has unjustly discriminated against it and that same gives Plaintiff a private cause of action under the Airport and Airway Development Act.

The Federal Aviation Act of 1958, 49 U.S.C. § 1349(a), provides generally that federal funds may not be expended for the maintenance or operation of air navigation facilities, except upon written recommendation and certification by the Secretary of Transportation. It further provides "There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." 49 U.S.C. § 1349(a). Apparently, Plaintiff contends Fulton County has violated this section by giving Hangar One an exclusive right prohibited under the statute.

Neither Act gives Plaintiff a private cause of action. Certainly, no express right of action is given. For the reasons given below, it is concluded that there is no implied right of action.

The United States Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975) identified the four factors to be taken into account in determining whether an implied right of action exists:

First, is the plaintiff "one of the class for whose *especial* benefit this statute was enacted," [citation omitted]—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? [Citation omitted]. Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [Citation omitted]. And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? [Citations omitted].

Subsequent cases indicate that congressional intent is the primary focus of this inquiry. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

A. *Section 1718*

The section reads in relevant part:

(a) As a condition precedent to his approval of an airport development project under this subchapter, the Secretary shall receive assurances in writing, satisfactory to him, that—

(1) the airport to which the project for airport development relates will be available for public use on fair and reasonable terms and without unjust discrimination, including the requirement that ... (B) each fixed-based operator using a general aviation airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-based operators making the same or similar uses of such airport utilizing the same or similar facilities.

The legislative history of this 1976 amendment provides in pertinent part:

1. Sponsors, in making decisions ·to undertake airport development, would be required to consult with air carriers and fixed-base operators using the airport. The term "fixed-base operator" includes those aviation-related businesses with permanent offices and facilities at an airport, such as aircraft distributors and dealers, aircraft rentals, flight training schools, mechanic schools, aviation maintenance, avionics sales and maintenance, aviation schools and businesses providing fueling, services, tiedown and hangar storage. *This new provision recognizes the legitimate interest of air carriers and fixed-base operators in development at airports.* This provision requires sponsors of air carrier airports to accord fixed base operators the same rights of consultation as air carriers in order that the views of both shall receive full consideration in determining the nature and scope of airport development projects for such airports.

. . . .

3. Sponsors would be prohibited from charging discriminatory rates, fees, rentals, and other charges to airport businesses which make the same or similar uses of such airport utilizing the same or similar facilities.

H.R.Rep. No. 94–594, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Ad. News 1600, 1614 (emphasis added).

The section at issue is an amendment to the Airport and Airway Development and Revenue Acts of 1970, which aims at providing "for the expansion and improvement of the Nation's airport and airway system." H.R.Rep. No. 91–601, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad. News 3047. This goal was to be achieved substantially "through the imposition and application of airport and airway user charges." *Id.* at 3047. These charges provided a means of funding development in the national air transportation system. The act also provided for an airport certification

system to assure compliance with safety standards. *Id.* at 3058. Section 1701, "Congressional Declaration of Policy" states that

The Congress hereby finds and declares—

. . . .

That substantial expansion and improvement of the airport and airway system is required to meet the demands of interstate commerce, the postal service, and the national defense.

Thus, the intended beneficiaries of the 1970 legislation are the users of the air transportation system, including the general public. However, Section 1718 as amended in 1976 does seem targeted in part for the benefit of fixed-base operators.

Turning to the first *Cort* factor, whether the statute was enacted for the particular benefit of a class to which Plaintiff belongs, *Cannon v. University of Chicago,* 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979) instructs that "[t]hat question is answered by looking to the language of the statute itself." Here, the reference to fixed base operators expressly identifies the class Congress intended to benefit; this is not a general ban on discriminatory airport regulation.

However, in this Circuit, the inquiry must continue:

What *Cort* demands is not that we determine whether Congress intended to aid a particular class of persons, but that we ascertain whether Congress intended to 'create a federal right in favor of the plaintiff.' [citation omitted].

*Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1079 (5th Cir.), *cert. denied sub nom. Moon v. Roadway Express,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). The Rehabilitation Act Section in *Frito-Lay* placed the direct obligation on the federal departments, and not on the contractors with which they made agreements for an inclusion of an affirmative action provision in government contracts. 611 F.2d at 1079. The statute here requires the "Secretary" to receive assurances from sponsors, thereby creating only an indirect duty on sponsors. Thus, Section 1718 does not confer a

"clearly defined right on the benefitted class." 611 F.2d at 1079. *See also Till v. Unifirst Federal Savings and Loan Ass'n,* 653 F.2d 152 (5th Cir.1981); *United States v. Capeletti Brothers,* 621 F.2d 1309 (5th Cir.1980). As the *Frito-Lay* court said:

When a statute is structured as a directive to federal agencies and does not clearly define a right inhering in individual members of a benefitted class, there must be persuasive evidence in the legislative history that Congress intended to confer such a right before the courts are justified in concluding that one exists.

611 F.2d at 1080.

This leads to a consideration of the second *Cort* factor. The legislative history of the statute here does not explicitly or implicitly create or deny a private right of action, although the "legitimate interest . . . of fixed-base operators in development at airports" is recognized. H.R.Rep. No. 94–594, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Ad.News at 1614. This, however, falls far short of indicating an intent to create a private right to sue an airport sponsor for breach of Section 1718.

The Act as a whole, a system of airport funding, does not contain sanctions. Although the implication of a private remedy here would not undermine a Congressionally-established remedial scheme, neither would it further the funding and grant mechanism established. Moreover, viewing the aviation statutes in their entirety, these enactments do comprise an intricate and comprehensive regulatory and enforcement scheme which explicitly provide for private remedies in certain cases, *see e.g.,* 49 U.S.C. § 1487, and which the Court should be reluctant to modify.

Fourth, there is no question but that regulation of airports is a matter of federal concern. This last *Cort* factor would appear to be in Plaintiff's favor.

■ Nevertheless, *Transamerica Mortgage Advisors* and *Touche Ross* suggest that it is the first two factors with which the Court should be most concerned. These two factors, as well as the third preponder-

ate against implying a private right of action based on Section 1718. Although there is pre-*Cort* precedent to the contrary, *see, e.g. Southern Airways Inc. v. City of Atlanta,* 428 F.Supp. 1010 (N.D.Ga.1977), the Court believes that the trend of Supreme Court decisions and this Circuit's authority requires the conclusion that a private right of action based on Section 1718 may not be implied in this case.

### B. *Section 1349*

The case against implication of a private cause of action under 49 U.S.C. § 1349 is even stronger. That statute reads in relevant part:

(a) No Federal funds, other than those expended under this chapter, shall be expended, other than for military purposes (whether or not in cooperation with State or other local governmental agencies), for the acquisition, establishment, construction, alteration, repair, maintenance, or operation of any landing area, or for the acquisition, establishment, construction, maintenance, or operation of air navigation facilities thereon, except upon written recommendation and certification by the Administrator that such landing area or facility is reasonably necessary for use in air commerce or in the interests of national defense. Any interested person may apply to the Administrator, under regulations prescribed by him, for such recommendation and certification with respect to any landing area or air navigation facility proposed to be established, constructed, altered, repaired, maintained, or operated by, or in the interests of, such person. *There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended.*

Considering the first *Cort* factor, there is no explicit designation in this statute of fixed-base operators as its beneficiaries. The provision, in this Court's view, is meant to inure to the benefit of the general public. Plaintiff cites the interpretation given to the predecessor of Section 1349 by the Attorney General. However, this quotation is silent as to the primary beneficiaries of the anti-monopoly policy it states is manifested in the statute:

[T]he legislative history shows that the purpose of the provision is to prohibit monopolies and combinations in restraint of trade or commerce and to promote and encourage competition in civil aeronautics in accordance with the policy of the Act.

40 Op.A.G. 71 (1941).

Second, the legislative history neither creates nor denies a private cause of action.

Third, the Federal Aviation Act of 1958 as a whole established the Federal Aviation Agency to solve air space use and air safety problems for both civil and military aircraft that had achieved notoriety following certain disastrous air crashes. H.R. No. 2360, *reprinted in* 85th Cong. 2d Sess., [1958] U.S. Code Cong. & Ad.News 3741–42.[3] The act expressly creates private cause of action for violation of Section 1371(a). 49 U.S.C.A. § 1487. It would seem that where Congress intended in this act to create a private right of action, it knew how to do so.

■ The Court is unpersuaded by Plaintiff's citation of *Niswonger v. American Aviation, Inc.,* 411 F.Supp. 763 (E.D.Tenn. 1975), *aff'd,* 529 F.2d 526 (6th Cir.1976). The district court decision preceded *Cort v. Ash,* and its affirmance, although subsequent to *Cort,* was without published opinion. Moreover, the precise question at issue there was whether the "exclusive right" prohibited by the statute applied to all aeronautical uses or to a particular use, such as a fixed-base operation. 411 F.Supp. at 766. In addition, post-*Cort* authority, *Guthrie v. Genesee County,* 494 F.Supp. 950 (W.D.N.Y. 1980) concludes that there is no private right of action under Section 1349. The Court therefore holds that no individual

---

**3.** However, the particular provision at issue was previously enacted as Section 303 of the 1938 Civil Aeronautics Act.

right of action under this statute may be implied in this case.[4]

## II. *Antitrust Claims*

Plaintiff's Complaint generally alleges violations of the Sherman and Clayton Acts. In response to Defendants' summary judgment motions, Plaintiff apparently has dropped its Clayton Act charge and has specified three allegations under Sections 1 and 2 of the Sherman Act. It alleges that the "series of lease agreements" between Fulton County and Hangar One are "contracts in restraint of trade" within the meaning of section 1, 15 U.S.C. § 1; that Defendants attempted to monopolize business at the airport in violation of Section 2, 15 U.S.C. § 2; and that Defendants conspired to monopolize in violation of Section 2.[5]

**4.** Moreover, even if a private right of action existed, it is doubtful whether Plaintiff Hill would have standing to assert it, since there is no indication that it has an immediate need for additional space. Efforts by incumbent fixed base operators having no present need to take over additional space, which would exclude a new operator desiring such space might in themselves be an attempt to create an "exclusive right." *See generally* Exhibit B to Affidavit of Robert E. Harris, Assistant Chief, FAA Atlanta District Office.

**5.** There is a question whether the County is immune from the federal antitrust laws in its dealings with fixed base operators at the Airport. The doctrine of state action immunity from antitrust began with *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), which held that the federal antitrust laws do not prohibit a state, in the exercise of its sovereign powers, from imposing certain anticompetitive restraints. In its latest pronouncement on the application of the doctrine to a state's political subdivisions in *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Supreme Court made it clear that actions of a municipality will be exempt from antitrust when they are directed by the state in its sovereign capacity, or when such actions are "in furtherance or implementation of clearly articulated and affirmatively expressed state policy." 102 S.Ct. at 841. The Court held that the requirement of "clear articulation and affirmative expression" is not satisfied "when the State's position is one of mere *neutrality* respecting the ... actions challenged as anticompetitive. A state that allows its municipalities to do as they please can hardly be said to have 'contemplat-

Without conceding that their conduct violated any of the substantive Sherman Act provisions, Defendants urge at the outset that their activities are protected from antitrust attack under the *Noerr-Pennington* doctrine. That doctrine, derived from two Supreme Court decisions, holds that joint efforts to influence certain legislative and executive governmental action do not violate antitrust laws regardless of their anticompetitive intent or effect. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). This conclusion rests on the necessity of preserving the informed operation of government and of protecting the right to petition guaranteed by the First Amendment. In *Noerr,* the Supreme Court found that Congress had intended in

ed' the specific anticompetitive actions for which ... liability is sought." *Id.* 102 S.Ct. at 843.

Since the *City of Boulder* decision, the 10th Circuit has applied this standard, in a case remarkably similar to our own, to hold that a city's lease arrangements and other dealings with fixed base operators at its airport are not subject to federal antitrust laws. *Pueblo Aircraft Service v. City of Pueblo,* 679 F.2d 805 (10th Cir.1982). Several other courts have reached the same conclusion, albeit without benefit of the Supreme Court's teaching in *City of Boulder. See Padgett v. Louisville and Jefferson County Air Board,* 492 F.2d 1258 (6th Cir.1975); *E.W. Wiggins Airways, Inc. v. Massachusetts Port Authority,* 362 F.2d 52 (1st Cir.) *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *see also Continental Bus System, Inc. v. City of Dallas,* 386 F.Supp. 359 (N.D.Tex.1974); *but see Pinehurst Airlines, Inc. v. Resort Air Service, Inc.,* 476 F.Supp. 543 (M.D.N.C.1979) (no immunity for county board and county airport); *In Re Airport Car Rental Antitrust Litigation,* 474 F.Supp. 1072 (N.D.Cal. 1979); *Woolen v. Surtran Taxicabs, Inc.,* 461 F.Supp. 1025 (N.D.Tex.1978).

The issue is not any easy one and courts are in disagreement. Although a decision that the County is immune from the Sherman Act in this instance would alleviate the need to decide the summary judgment motion on the merits of the antitrust claims, the Court declines to reach the question where the parties have not had an opportunity to brief it. 10 Wright, Miller & Kane, Federal Practice and Procedure § 2725 (1973).

the Sherman Act to regulate only "business activity," not "political activity," noting the "essential dissimilarity between an agreement jointly to seek legislation and the agreements traditionally condemned by § 1 of the Act." 365 U.S. at 136–37, 81 S.Ct. at 528–29.

While the doctrine is potentially quite broad in scope, lower courts have not held that all efforts to influence government officials are protected from antitrust scrutiny. *Noerr* itself dealt only with efforts to seek passage of favorable *legislation* But government officials perform a host of functions beyond their legislative capacities, including regulatory, adjudicatory, and purely managerial, proprietary or economic functions. *Noerr* has never been thought to immunize private parties seeking to influence officials without regard to the nature of the activity.

As the Fifth Circuit put it aptly:

Basic to *Noerr* is a belief that regulation of competition by the political process is legitimate and not proscribed by the Sherman Act, an enactment which is itself a political decision. For the political process to be effective there must be freedom of access, regardless of motive, to ensure the "right of the people to inform their representatives in government of their desires with respect to the passage in enforcement of laws." 365 U.S. at 139 [81 S.Ct. at 530] [other citations omitted]. When these political considerations are absent the *Noerr* doctrine is inapplicable. [Citations omitted]. The policies of the Sherman Act should not be sacrificed simply because defendants employ governmental processes to accomplish anti-competitive purposes. Otherwise, with governmental activities abounding about us, government could engineer many to antitrust havens.

**6.** The "commercial" limitation on *Noerr-Pennington* is also consistent with the unavailability of antitrust immunity to public officials themselves where they are not acting "in furtherance or implementation of clearly articulated and affirmatively expressed state policy." *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d

*Woods Exploration and Pro. Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1296–97 (5th Cir.), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972).

Thus, *Noerr* applies to insure access to *policy makers,* where action is designed to influence *policy. Id; George R. Whitter, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1st Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970), *on remand,* 376 F.Supp. 125 (D.Mass.), *aff'd,* 508 F.2d 547 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). It is not a defense for parties who seek to influence officials acting in a purely commercial, or proprietary, rather than "governmental" capacity. *Id. Federal Prescription Service v. American Pharmaceutical Assn.,* 1981–2 Trade Cases (CCH), ¶ 64,217 (D.C.Cir.1981); *In re Airport Car Rental Antitrust Litigation,* 474 F.Supp. 1072 (N.D.Cal.1979). This result is consistent with First Amendment analysis affording a lesser degree of protection to First Amendment activities that are purely commercial in nature. Thus,

[a] private party's right to petition the government ... must yield to the compelling governmental interests expressed in the antitrust laws when the public body being "petitioned" is acting as a commercial entity influenced by economic concerns rather than as a policymaking unit of government.

*Id.* 1091.[6]

The line between policymaking and commercial activity is not easy to draw, as the case before the Court makes clear. While the ultimate conclusion whether activity is commercial or policymaking is a matter of law, the decision will turn on specific factual considerations. On this record, the Court cannot conclude that the activities of Defendants fit one category or the other. All

810 (1982). *See* n. 5, *supra.* The state immunity cases indicate that antitrust laws may apply with full force to governmental units acting in an independent commercial capacity. *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).

parties agree that the County was attempting to cooperate with FAA policy to move general aviation traffic from Hartsfield to the county airport; on the other hand, evidence adduced by both sides suggests that the Commission's dealings with Hangar One with respect to various leases were in its commercial capacity as landlord of the airport, and nothing more. Based on this record, supporting as it does conflicting views of the evidence, the Court cannot grant a motion for summary judgment on *Noerr-Pennington* grounds. We therefore turn to the merits of the antitrust allegations themselves.

■ In considering the motions for summary judgment, the Court is mindful of the general rule that "summary procedures should be used sparingly in complex antitrust litigation. . . ." *Poller v. Columbia Broadcasting System, Inc., et al.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). The Court is also aware that the party opposing the motion is entitled to all reasonable inferences that may be drawn in its favor, *General Chemicals v. Exxon Chemical Co., U.S.A.,* 625 F.2d 1231, 1233 (5th Cir.1980), and that this Court is to "cull the universe of possible inferences from the facts established." *American Telephone & Telegraph Co. v. Delta Communications Corp.,* 590 F.2d 100, 102 (5th Cir.) (per curiam) (on petition for rehearing), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). It is not the Court's function to weigh conflicting inferences against each other on a motion for summary judgment but merely to weigh those inferences favorable to the opposing party "against the abstract standard of reasonableness." *Southway Theatres, Inc. v. Georgia Theater Co.,* 672 F.2d 485, 493 (5th Cir.1982).[7]

Plaintiff's first charge is that the leases which Hangar One acquired by assignment at the airport, which were approved and later consolidated by agreement with the Fulton County Commission, constitute contracts in restraint of trade, in violation of Section 1.

■ The essence of a violation under Section 1 is twofold: (1) that there be an agreement or mutual commitment to engage in a common course of anticompetitive conduct; and (2) that the agreement produce "an unreasonable restraint of trade." *Greyhound Rent-A-Car v. City of Pensacola,* 676 F.2d 1380, 1383 (11th Cir.1982); *Daniels v. All Steel Equipment Co.,* 590 F.2d 111 (5th Cir.1979).

■ In order to defeat summary judgment on the second element, Plaintiff must adduce evidence showing a genuine issue for trial on the impact of the alleged conduct on the relevant market. *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111, 113 (5th Cir.1979); *Lektro-Vend Corp. v. Venda Co.,* 660 F.2d 255, 269 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Plaintiff defines the relevant market as the business served by the instrumented runway, but has produced no evidence of adverse impact on prices or supplies in that market. Indeed, the only evidence in the record arguably pertinent to this question—showing that Hill's share of the market has been reduced from over 90% to around 60%—actually undercuts Plaintiff Hill's claim of anticompetitive effect. Certainly, it is enough to require Plaintiff to show *some* evidence of anticompetitive effect to create a triable issue. "The first step in establishing an unreasonable restraint of trade is to show anticompetitive effect, either in the intrabrand or interbrand markets." *H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 246 (5th Cir.1978). Absent any evidence requiring a trial on this issue, summary judgment will be granted.

■ Plaintiff's charge of an attempt to monopolize under Section 2 must fail for similar reasons. Essential to such a charge is that the alleged conduct create a "dangerous probability" that the attempt will be successful. *America Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 276 (5th

**7.** Former Fifth Circuit case.

Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). The Fifth Circuit also requires proof of the relevant market in attempt cases. *In Re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d 436, 441 (5th Cir.1982). Plaintiff has adduced no evidence, beyond its bald allegations, to show a dangerous probability of monopolization in a relevant market. *See Dimmitt Agri Industries, Inc. v. CPC Intern. Inc.,* 679 F.2d 516, 525 (5th Cir.1982). While the facts underlying a finding of dangerous probability will vary with the circumstances, the Court considers it a matter of common sense that no such facts are presented here.

■ Finally, Plaintiff alleges a conspiracy to monopolize in violation of Section 2, a charge which Plaintiff correctly points out is distinct from the attempt charge or from a Section 1 conspiracy. *See Associated Radio Serv. Co. v. Page Airways, Inc.,* 624 F.2d 1342, 1356–57 n. 24 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981). The elements of a Section 2 conspiracy to monopolize are: (1) a conspiracy; (2) a purpose to achieve monopoly power; and (3) a specific intent to injure the plaintiff as well as to monopolize. *Id.*[8] Unlike a Section 1 conspiracy, the Section 2 offense must be a conspiracy to monopolize, not merely to restrain trade, and specific intent, rather than general intent, is required.

■ In Section 1 conspiracies, intent will be inferred as a matter of course from ordinary business conduct since all that must be shown is that each party acted with the general intention that his acts have the consequences they did have and with the knowledge that at least one other party would act in conjunction with him. *Von Kalinowski, supra,* at § 6.01[3]; *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In Section 2 conspiracies, on the other hand, specific intent to injure the plaintiff and to

monopolize may not be inferred from routine activities that are otherwise motivated by legitimate and proper business considerations. Nor should specific intent be inferred where the alleged damages are caused by factors other than Defendants' conduct. Indeed, courts which infer specific intent under Section 2 usually do so only where the alleged business practices are themselves unlawful, such as with price-fixing, boycotts, tying arrangements, or other unlawful or predatory activities. *See United States v. Crescent Amusement Co.,* 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160 (1944), *reh. denied,* 323 U.S. 818, 65 S.Ct. 437, 89 L.Ed. 650 (1945) (group boycott).

■ In this case Defendants are parties to a lease agreement which is not alleged to be unlawful in itself. Further, the parties' dealings, including the leases themselves are regular on their face. No fact in the record suggests that any interest of Fulton County or its officials would be served by harming Plaintiff. There is no indication that Defendants' dealings have been underhanded or conducted in a manner which is unusual or questionable. There is no evidence of self-dealing on the part of Fulton County officials. In short, having reviewed the record, the Court is unable to find any evidence from which a trier of fact could infer a specific intent to harm Plaintiff. This omission is fatal to Plaintiff's claim of a Section 2 conspiracy.

Defendants' motions for summary judgment with respect to the antitrust claims therefore will be granted.

### III. *Due Process, Section 1983, Equal Protection Claims*

Plaintiff alleges violations of due process and equal protection, and seeks injunctive relief and damages under the Constitution and 42 U.S.C. § 1983. Specifically, Plaintiff alleges that certain property designated in its lease with Fulton County also has been leased to Hangar One, creating an

---

**8.** Unlike the attempt charge, it is not necessary in a conspiracy charge to demonstrate a dangerous probability of success; the specific intent to monopolize is the only showing required. *Associated Radio Serv. Co. v. Page Airways, Inc.,* 624 F.2d 1342, 1356–57 n. 24 (5th Cir.1980); Von Kalinowski, 3 Antitrust Laws and Trade Regulations § 9.02[3] (1982).

encroachment on Hill's property interest in violation of due process. Plaintiff also urges that Fulton County's lease of land on which Hill's tank farm facilities are located violates due process, and that Plaintiff has a protectible property interest in being "free from anticompetitive injury." Finally, Plaintiff argues that its due process rights were violated when Hangar One's "option" was enlarged to include Lots 5 and 6 without a hearing.[9]

▮ These contentions can be disposed of in short order. First, after its lease on the tank farm expired in 1977, Plaintiff ceased to have any interest in the land on which the tanks were located, and had an interest only in the tanks which it had purchased. Plaintiff has not alleged, nor is there evidence, that subsequent leases of the property have interfered with Plaintiff's use of the tanks. Plaintiff has alleged neither interest nor injury with respect to the leases themselves. Second, the law does not recognize a right under the due process clause of a business to be free from "anticompetitive injury." This argument smacks of long-discredited *Lochner* -type substantive due process. *See Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Nowak, Rotunda & Young, Handbook on Constitutional Law 407 (1978). As to the alleged expansion of Hangar One's option to include Lots 5 and 6, Plaintiff has no due process property interest in land to which it has no lease or any other legal relationship. *See Murdock v. City of Jacksonville,* 361 F.Supp. 1083, 1096–97 (M.D. Fla.1973). Moreover, there are no facts in the record to support any contention that the County deviated from established procedures with respect to Hangar One's option, or that Plaintiff had a protectible interest by virtue of a legitimate expectation that certain procedures would be followed.

As to the alleged encroachment on Hill's lease, the Court views the issue as at most a private contract dispute not of constitutional dimension. Plaintiff's allegation is basically that Fulton County leased the same land twice—once to Hill and then to Hangar One. Plaintiff is not asserting that Fulton County itself is in possession or control of the land. If indeed it is true that certain property was attempted to be leased to two different parties at one time, then clearly one party or the other—not Fulton County—has the right to use the land. Thus, Plaintiff's claim that there has been a wrongful "taking" of its leased property by Fulton County is a hollow one, even if Hill has the superior claim to the disputed area. Since there has been no "taking" by a governmental body, there are no constitutional concerns to be addressed.

▮ Plaintiff also appears to be urging generally that Fulton County's failure to put the leases now held by Hangar One, as well as other leases held by various third parties, up for competitive bid deprived Hill of due process. This contention fails because Hill has been deprived of no property to which it had a legitimate claim of entitlement. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The Court finds Plaintiff's equal protection claims to be equally without merit. As an initial matter, the mere fact that the County has signed contracts with Hangar One different from those it has signed with Plaintiff, for different parcels of land, is not enough to trigger an equal protection inquiry. Plaintiff must show that it is situated similarly to Hangar One but treated differently. But there has been no showing that Plaintiff was ever in a position to acquire the leases which Hangar One nego-

9. Plaintiff contends that each of the above occurrences is evidence that it has been treated less favorably than Hangar One in violation of

equal protection, an issue that is addressed *infra.*

tiated. Therefore, the parties in fact are not situated similarly.[10]

Having found an absence of issues for trial on the § 1983 and underlying constitutional claims, the court grants summary judgment as to those claims.

## IV. Summary

The Court GRANTS Defendants' Motions for Summary Judgment as to all claims. The Clerk is DIRECTED to enter judgment for Defendants.

10. Even if such a showing is made, where no fundamental rights or suspect classes are involved, as in this case, the action of the County in treating the two operators differently need only bear a rational relationship to a legitimate interest. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). Where a legitimate state interest can be conceived, and where the state action is rationally related thereto, equal protection requirements are satisfied. *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959).