The CITY OF POMPANO BEACH, a Florida municipal corporation, Petitioner,

v.

FEDERAL AVIATION ADMINISTRATION, Respondent.

James C. Brettman, Intervenor.

No. 84–5331.

United States Court of Appeals, Eleventh Circuit.

Nov. 4, 1985.

Donald C. Roberge, City Atty., Pompano Beach, Fla.; for petitioner.

Mark L. Gerchick, Paul, Hastings, Janofsky & Walker, Judith Richards Hope, Leonard A. Ceruzzi, Washington, D.C., for J. Brettman.

Before RONEY and TJOFLAT, Circuit Judges, and BROWN *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Petitioner, the City of Pompano Beach, Florida, seeks direct review of a determination by the Federal Aviation Administration (FAA) [1] that the City has been operating its airport in violation of section 308(a) of the Federal Aviation Act of 1958, as amended, 49 U.S.C.App. § 1349(a) (1982),[2] and in non-

---

* Honorable John R. Brown, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. This court has jurisdiction to review final orders of the Administrator of the Federal Aviation Administration. 49 U.S.C.App. § 1486(a) (1982). Following a four-day hearing, a hearing officer issued his "Findings and Decision of the Hearing Officer," followed by a "Specific Order." The City, petitioner before us, declined to appeal the hearing officer's order to the Administrator pursuant to section 13.20(g) of the Federal Aviation Administration Regulations. 14 C.F.R. § 13.20(g) (1984). The order of the hearing officer therefore became the final order of the Administrator. 14 C.F.R. § 13.20(h) (1984).

2. 49 U.S.C.App. § 1349(a) (1982) provides in pertinent part:

§ 1349. **Expenditure of Federal funds for certain airports and air navigation facilities; location of airports, landing areas, and missile and rocket sites**

(a) No Federal funds, other than those expended under this chapter, shall be expended, other than for military purposes ..., for the acquisition, establishment, construction, alteration, repair, maintenance, or operation of any landing area, or for the acquisition, establishment, construction, maintenance, or operation of air navigation facilities thereon, except upon written recommendation and certification by the Secretary of Transportation that such landing area or facility is reasonably necessary for use in air commerce or in the interests of national defense.... There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended. For purposes of the preceding sentence, the providing of services at an airport by a single fixed-based operator shall not be construed as an exclusive right if it would be unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide such services, and if allowing more than one fixed-based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such fixed-based operator and such airport.

compliance with the terms and conditions of the deed which transferred ownership of the airport property from the United States to the City.[3] The FAA based this determination on a finding that the City was unjustly discriminating against an applicant for a lease to do business at the City's airport and was, in effect, granting an exclusive right to the incumbent lessees. Holding that there was substantial evidence in the record to support the factual findings of the agency and that the agency's application of the governing law to those facts was reasonable, we affirm.

## I.

The facts in this case are crucial to our holding; they involved the protracted attempt by Pompano Beach businessman and aviator James Brettman,[4] starting May 30, 1979, to lease between ten and twelve acres at the Pompano Beach Air Park (Air Park) to construct aircraft hangars and covered storage space for airplanes. From the beginning, Brettman sought a lease from the City which would allow him to be competitive with incumbent lessees providing sim-

ilar services at the Air Park. Brettman's original plan was only to rent hangar and storage space to the owners of small, single and twin-engine airplanes using the Air Park and not to offer the general aviation services provided by the other Air Park tenants. Any services not provided by the other tenants might be made available at the Brettman facility solely for aircraft based there, he said.

At the time of Brettman's request, aircraft storage services were being provided at the Air Park by two incumbent fixed base operators,[5] Pompano Air Center and Pompano Aviation. Pompano Air Center was owned and operated by John Becker. In 1977, Pompano Air Center entered into a twenty-one-year lease with the City. The lease imposed upon Pompano Air Center no obligation to spend money for the improvement of its facilities and provided that Pompano Air Center would be governed by the City's standards for fixed base operators and Air Park tenants adopted in 1967. Pompano Air Center's lease was amended in August 1978; the City agreed that, in return for Pompano Air Center's commit-

---

**3.** The Pompano Beach Air Park was formerly a World War II naval training facility; it was conveyed to the City by the federal government by quitclaim deed in 1947, pursuant to the Surplus Property Act of 1944. That Act, today at 50 U.S.C.App. § 1622(g) (1982), provides that all property disposed of shall be used and maintained for the benefit of the public interest without unjust discrimination, 50 U.S.C.App. § 1622(g)(2)(B) (1982), and that no exclusive right for the use of the airport shall be granted. 50 U.S.C.App. § 1622(g)(2)(C) (1982). The deed also contains specific covenants providing that the airport property "shall be used for public airport purposes, and for only such purposes, on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right for use of the airport within the meaning of Section 303 of the Civil Aeronautics Act of 1938," the predecessor to 49 U.S.C.App. § 1349(a) (1982). *See supra* note 2. The deed of conveyance provides that, in the event any of the conditions or covenants contained therein are breached by the City, the property shall revert to the federal government at its option sixty days after the date of its demand, unless the City cures the breach within the sixty-day period.

The Administrator of the FAA is charged with "the sole responsibility for determining and enforcing compliance with the terms, conditions,

reservations, and restrictions contained in any instrument of disposal by which surplus property is or has been transferred to ... municipalities ... pursuant to the Surplus Property Act of 1944" for use as an airport. 50 U.S.C.A.App. § 1622b (West Supp.1985). Because in this case the Administrator is pursuing a remedy under the Federal Aviation Act of 1958, 49 U.S.C.App. § 1349(a), rather than the remedy contained in the City's deed of conveyance, we focus our analysis upon the requirements of the Federal Aviation Act.

**4.** James Brettman appears in this case as an intervenor, pursuant to 14 C.F.R. § 13.51 (1984), as he has no private right of action under 49 U.S.C.App. § 1349(a), see *Hill Aircraft & Leasing Corp. v. Fulton County,* 561 F.Supp. 667, 670 (N.D.Ga.1982), *aff'd,* 729 F.2d 1467 (11th Cir.1984), or pursuant to the deed conveying the airport property from the federal government to the City.

**5.** A "fixed base operator" is one who " 'provides services [at an airport] similar to those that a service station provides for those who operate automobiles.' " *Guthrie v. Genesee County,* 494 F.Supp. 950, 952 n. 1 (W.D.N.Y.1980) (quoting *Pinehurst Airlines, Inc. v. Resort Air Services, Inc.,* 476 F.Supp. 543, 553 (M.D.N.C.1979)).

ment to construct $200,000 worth of airplane hangars and other facilities at the Air Park, the City would extend the company's lease to thirty years, beginning in 1978. The lease of the second fixed base operator on the Air Park at the time of Brettman's application, Pompano Aviation, is not pertinent to these proceedings.

Brettman's application for a lease was referred to the Pompano Beach Air Park Advisory Board. The Board formally considered the matter for the first time at its June 19, 1979 meeting. At that meeting, the Board tabled Brettman's application for three months pending further study of his proposed "condominium/cooperative" building concept and the impact additional hangar facilities would have upon the existing fixed base operators. Significantly, several members of the Advisory Board said they were concerned that the Brettman proposal would take lucrative hangar service business away from Pompano Air Center and Pompano Aviation, leaving them with the less profitable fuel service, parking facilities, line service, and flight school. They also noted that Pompano Air Center had thirty-six vacant hangar units and that the two existing fixed base operators were leasing land they were not yet using. Becker, the owner of Pompano Air Center, suggested that, if the Board were subsequently to recommend the City's acceptance of Brettman's application, it should require Brettman to come onto the Air Park as a full fixed base operator, providing a litany of aviation services over and above just hangar storage space. He protested that it would be unfair to make the two existing fixed base operators provide such services, at great expense to them, and not to impose the same obligation on Brettman.

On June 22, 1979, Brettman wrote the FAA's regional compliance specialist about the situation, saying that his application for a lease met the City's published minimum standards [6] for leasing land at the Air Park

and that the City's delay in taking action thereon was discriminatory. On July 10, 1979, the Advisory Board unanimously reaffirmed its previous decision to table Brettman's application.

On July 26, 1979, Pompano Aviation was sold to Executive Aviation of Pompano, which commenced doing business under a new lease with the City on that same day. One of the conditions of the sale was that the City could update and modify Pompano Aviation's lease. The City did so, making a new lease with Executive which provided that the company would be a fixed base operator at the Air Park for a term of thirty years and would expend $100,000 on improvements to the leased property. The new lease also required Executive to adhere to the provisions of the City's 1967 minimum standards for fixed base operators and tenants.

Two days before Executive Aviation's new lease was signed, the Pompano Beach City Commission adopted by resolution a revised set of minimum standards applicable to Air Park tenants and fixed base operators. These revised standards, formulated by the Air Park Advisory Board, had been under development for some time, according to Air Park's manager.

Brettman next discussed his application with the Advisory Board at its regular monthly meeting of September 11, 1979; [7] Brettman presented the Board with a scale model of his proposed hangar facility. Becker appeared and objected to Brettman's proposal because the City presently had two operators providing aviation services at the Air Park seven days a week. He renewed his position that Brettman should not be permitted to come onto the Air Park and siphon the existing fixed base operators' profitable hangar business, taking "the gravy off the top" and leaving them with only labor intensive and less profitable services. Despite Becker's opposition, the Advisory Board voted three to

---

**6.** In his original application for a lease at the Air Park, Brettman sought to qualify as an Air Park tenant, rather than as a fixed base operator, as provided by the City's minimum standards published at that time.

**7.** The Board did not hold a meeting during the month of August 1979.

two to recommend that the City Commission approve Brettman's proposal.

On October 10, 1979, the Pompano Beach City Attorney advised the city manager that the City's minimum standards did not permit a lessee, as a mere Air Park tenant, to rent aircraft storage space; rather, to rent such space the lessee must qualify as a fixed base operator, under one of five categories set out in the City's minimum standards, and provide more complete aviation services. In response, Brettman, on November 11, 1979, changed his request and sought a fixed base operator lease.

During the next year, Brettman and the city attorney attempted to negotiate a lease. Brettman wanted a fixed base operator lease under the flight instruction category of the standards; he proposed a lease for thirty years with a required minimum investment of $150,000. In addition to providing aircraft storage space, Brettman was proposing a flight training facility with at least one instructor, two aircraft, and classroom space. The city attorney counteroffered the City's "standard lease," which contained provisions and requirements not included in the existing fixed based operators' leases.

On December 16, 1980, the Air Park Advisory Board recommended to the City Commission that the City enter into a twenty-year lease with Brettman with two provisos: that Brettman be required to spend at least $200,000 on facilities and that his ability to sublease hangar space be limited to a period of one year, a limitation not included in the existing leases. The City offered Brettman the recommended lease. He rejected the offer because the lease term was shorter than those of existing fixed base operators and he would be required to make a larger capital investment. Brettman returned to the Advisory Board on several occasions during the next eighteen months in an attempt to eliminate these objectionable conditions. He failed, and in February 1981, November 1981, and April 1982 the City repeated the same offer, a twenty-year lease with a minimum required investment of $200,000.

On February 10, 1981, Brettman notified the Air Park manager that he wished to amend his application for a fixed base operator lease, under the flight instruction category of the City's standards, to request a fixed base operator lease encompassing the same services and facilities as Pompano Air Center and Executive Aviation. In essence, Brettman sought permission to operate at the Air Park on precisely the same basis as the incumbent fixed base operators. The City repeated its twenty-year lease offer, provided that Brettman demonstrate his financial responsibility to the City's satisfaction; thus, they asked him to submit to the Air Park Advisory Board detailed financial information about his proposed fixed base operation. Brettman countered with a proposed lease that reflected the changes necessitated by his decision to become a full-service fixed base operator. The form of Brettman's proposed lease replicated exactly the form of the leases held by Pompano Air Center and Executive Aviation. The city attorney, on April 9, 1981, rejected Brettman's proposal out of hand, saying that the City's offer, a twenty-year lease with a required investment of $200,000, represented an improvement over the City's previous offers.

The City refused to offer Brettman a lease containing the identical provisions appearing in the existing leases. On June 23, 1981, the Air Park's manager wrote Brettman that, because negotiations had reached an impasse, he planned to take no further action on Brettman's request. His stated reason for the breakdown in negotiations was the consistent opposition among city officials to Brettman's "condo hangar" concept, i.e., the long-term leasing of aircraft storage facilities. The manager advised Brettman to search for another airport with which to do business.

On July 6, 1981, Brettman filed a complaint with the FAA in which he stated that the City "has refused to grant an additional lease under the same terms and conditions they have granted two others for similar operations on the Air Park, therefore, the City appears to confer an exclusive right of enjoyment of a privilege to

some which they deny to others." Brettman alleged that the City's conduct constituted a violation of federal law.

On September 2, 1981, Becker presented the Air Park Advisory Board with a proposal that he purchase the financially foundering Executive Aviation and assume its fixed base operator lease with the City. Within two months Becker arranged a lease agreement between his son, Brian, and the City that permitted Brian to take over Executive's fixed base facilities at the Pompano Air Park, subject to Executive's $100,000 minimum investment obligation, and to operate them during the remaining twenty-eight years of Executive's lease term. The City did not require Brian Becker to adhere to the revised minimum standards adopted in 1979 and imposed upon Brettman; it would be enough if he adhered to the 1967 standards applicable to his father's fixed base operation. Nor did the City request of Brian Becker the detailed financial information—such as projected gross revenues and operating costs for each year of the lease, pricing policies, and a proposed schedule of charges—it had asked Brettman to present nine months earlier, in February 1981.

For tax purposes, the senior Becker chose to set up a separate corporation for his newly acquired fixed base operation, rather than have Pompano Air Center absorb it. Becker called the new corporation Bec-Air, Inc. The stock in Bec-Air was held by Brian Becker, who, in addition to being an officer in Pompano Air Center, was made president, treasurer, and director of Bec-Air. The two Becker facilities, which are adjacent to each other on the Air Park, essentially have been operated and maintained as a single business entity. Pompano Air Center employs a staff of between thirty to fifty persons, including pilots, mechanics, and office staff. All the mechanics have mechanics' licenses, and the pilots are qualified to instruct. The company provides a full range of aeronautical services, including flight instruction, aircraft maintenance, fuel, oil, rental hangar storage space, and outside aircraft tie-down service. It also holds a dealership for at least two aircraft manufacturers, selling both propeller and small jet aircraft, and is the headquarters for the United States aerobatic team. In contrast, Bec-Air employs three persons, a clerk and two line persons who hold no professional FAA certificates. Bec-Air provides no mechanical service or maintenance to aircraft but simply refers all maintenance work to Pompano Air Center; a plane with mechanical problems must either taxi to Pompano Air Center or wait for a tow from a Pompano Air Center truck, as Bec-Air has no equipment with which to provide towing service. The only aeronautical service Bec-Air provides is fuel. Bec-Air also is not an authorized aircraft manufacturer's representative.

Despite the flat rejection from the Air Park manager in July 1981, Brettman continued to pursue a lease at the Air Park. On November 10, 1981, a week after the City approved its lease with Bec-Air, Brettman renewed his proposal and presented a detailed scale model of his plan to the Air Park Advisory Board. The Board repeated its recommendation to the Commission that Brettman be offered a twenty-year lease with a required investment of $200,000. Becker again voiced his objection to the Commission, this time in the form of a letter to its members dated February 12, 1982. The Commission responded as it had before; in April 1982 Brettman was offered a twenty-year lease with a $200,000 investment obligation. Though the City called the lease its "standard" lease, the City had modified it three times since 1977. According to the City, the changes were made to reflect its "evolving concerns" and to protect its, and thus, the public's, interest. By 1982, the City's "standard" lease, which incorporated the latest revised minimum standards for Air Park fixed base operators and tenants, contained numerous differences from the leases held by Pompano Air Center and Bec-Air. Brettman refused to accept the City's "standard" lease.

Still holding Brettman's complaint of July 6, 1981, the FAA, on March 10, 1983, issued a "Notice of Proposed Order" finding the City in noncompliance with federal law. The FAA charged that the City was

engaging in conduct which was unjustly discriminatory and was in effect granting an exclusive right to the Beckers. Detailing fifty proposed findings of fact, the FAA concluded that the City's limitation of Brettman's lease term to twenty years with an obligation to expend $200,000 was unreasonable and unjustly discriminatory, particularly because the City had made other Air Park leases with more favorable terms while it was negotiating with Brettman. Additionally, the FAA said that, since Brettman had been attempting to secure a lease at the Air Park, the City had made a number of modifications in its minimum standards for Air Park leases, changed its interpretation of those standards, and applied those standards inconsistently. The FAA said the inconsistent application of the standards included, but was not limited to: restricting Brettman's ability to sell, assign, or sublease an interest in his leasehold; imposing a one-year maximum term on any sublease; requiring Brettman to qualify as a full fixed base operator before being permitted to rent aircraft storage space; requiring Brettman to operate under more than one category for fixed base operators and to construct facilities required by more than one category of the City's minimum standards; requiring Brettman to comply with unspecified future amendments to the City's minimum standards while exempting other lessees from the same obligation; and refusing to agree to the same or substantially parallel lease terms and conditions with Brettman as existed between the City and the incumbent lessees. The FAA said that the unexplained delays caused by the City were unreasonable and had the effect of unjustly discriminating against Brettman and granting an exclusive right to the existing Air Park lessees. The FAA notified the City that, as a result of its conduct, it faced several possible sanctions: ineligibility for any future federal funds for its Air Park; a civil penalty as provided in 49

U.S.C.App. § 1471(a) (1982); and loss of necessary FAA approval on any matter related to use of the airport property.

FAA's notice prompted the City into action. City officials contacted their Congressmen and arranged for a meeting between themselves and representatives of the FAA, which came to pass in Washington, D.C. on June 17, 1983. There the FAA heard the City's explanation for the differences between the "standard" lease offered Brettman in 1982 and the leases held by Pompano Air Center and Bec-Air. The FAA requested that the City send the agency a copy of its new "standard" lease and an analysis of the investments made by Pompano Air Center and Bec-Air. Pursuant to an apparent agreement reached at the Washington meeting, the City notified the FAA on June 23, 1983 that it would offer Brettman its current standard fixed base operator lease for a thirty-year term, provided that Brettman commit to an investment of $500,000.[8] The City forwarded the FAA a copy of its latest standard lease, omitting its revised minimum standards for Air Park fixed base operators which were incorporated by reference into the lease.

The assistant chief counsel for the FAA responded on July 7, 1983 that he had "reviewed the lease as submitted and it appears to be reasonable and not unjustly discriminatory...." The FAA did not comment upon the City's proposal to require Brettman to invest $500,000, saying that it would not negotiate the financial aspects of a lease for the parties. The FAA recommended that the

> City offer the standard lease which was sent to the FAA to Mr. Brettman and that the parties negotiate the financial terms of that lease between themselves, providing, of course, that any financial terms required by the City are reasonable and not unjustly discriminatory when compared to the financial terms of existing [fixed base operator] leases at the airport.

---

**8.** The City reported that, adjusted for increases in the Cumulative Price Index, Pompano Air Center had, over the years, made a cumulative investment at the Air Park of $1,016,781, and Bec-Air had made a cumulative investment of $550,060. Based upon these figures, the City said it was willing to offer Brettman a thirty-year lease if Brettman would commit to an investment of $500,000.

Accompanying the FAA's response was a withdrawal of its March 10, 1983 Notice of Proposed Order, contingent upon the City's agreeing to a stipulation requiring the City to offer Brettman its "standard fixed base operator lease which was enclosed in its letter to the FAA," to "negotiate in good faith the investment required" and to require an investment which "reflect[s] terms approximating those required of existing fixed base operators," and to amend its lease with Pompano Air Center to limit the term of subleases to one year so as to bring its lease in line with Brettman's lease.

Immediately thereafter, the City offered Brettman a thirty-year lease calling for a minimum investment of $500,000. The City said it would agree to reduce the required investment only if Brettman would accept a shorter lease. In addition to offering Brettman the standard lease reviewed and approved by the FAA, the City also attached its latest version of its minimum standards. As a result, a number of the provisions in the lease offered to Brettman differed from those in the leases held by Pompano Air Center and Bec-Air, including the provisions relating to transfer of control, compliance with future standards, the initial deposit, disclosure of financial information and business plans, gasoline taxes, the amount of the lessee's required investment, bankruptcy and liens, advance City approval of construction, and the rental rate.

Prompted by an inquiry from Brettman, the chief counsel for the FAA notified the City on September 1, 1983 that the City's latest offer to Brettman did not reflect the FAA's understanding of the City's obligations and commitments, which formed the basis of the FAA's agreement to withdraw its Notice of Proposed Order against the City. The chief counsel wrote that the FAA's withdrawal of its Notice was predicated upon the City offering Brettman a thirty-year lease and negotiating in good

faith the financial terms of that lease. It has been the FAA's view, wrote the agency's legal officer,

> that the financial terms of the Brettman lease which are susceptible to negotiation include not only the amount of investment, but also those terms of the lease which may have a direct impact on the financial viability of Mr. Brettman's proposed operation and on his ability to compete on an equal basis with the existing operators.

Additionally, the FAA official noted that he was surprised to learn that the City intended to impose additional conditions on Brettman by appending its "Standards for Fixed Base Operators" to Brettman's proposed lease. Because the City failed to submit these standards to the FAA, they were not considered by the FAA in its decision to withdraw its Notice against the City.

Maintaining that the July 7 stipulation only required the City to offer Brettman its standard lease with the incorporated minimum standards and to negotiate only the required investment provision, the City responded to the FAA that it was negotiating in good faith and in full accordance with the letter and the spirit of the City's agreement with the FAA as set forth in the stipulation. The FAA disagreed and on October 27, 1983 reissued its previous Notice of a Proposed Order, reinitiating formal administrative proceedings against the City.

An administrative hearing was conducted in February 1984. Following four days of testimony and the receipt of more than five hundred pages of exhibits, the hearing officer found that the lease the City offered Brettman contained provisions that were not applied to other lessees and that were unjustly discriminatory to Brettman. The hearing officer listed ten differences between the lease offered to Brettman and the leases held by the incumbent fixed base operators.[9] Additionally, the hearing offi-

---

**9.** The ten "unjustly discriminatory" provisions enumerated by the hearing officer pertained to:

  (a) Amount required for investment in capital improvements in the lease term of the Intervenor as distinguished from other

persons conducting fixed based operations at the Airpark.

  (b) Changes and modifications in the "standards" and "guidelines" of leases of the Intervenor and interpretation of the "stan-

cer concluded that the "extended period of time and delays in negotiating a lease between [Brettman] and the City ... result[ed] in benefits to other applicants of leases and lessees and [was] unjustly discriminatory [having] the effect of granting exclusive right to the use of ... Pompano Beach Airpark." Accordingly, the hearing officer ruled that the City was in violation of the Federal Aviation Act, 49 U.S.C.App. § 1349(a), and in noncompliance with the terms and conditions of its deed of conveyance. The City was ordered to cease and desist unjustly discriminating against Brettman and to offer Brettman a lease containing terms and conditions substantially identical "to those in the leases between the City and incumbent airplane fixed base operators at the Air Park." The hearing officer advised the City that, if it remained in violation of the Federal Avia-

tion Act and the covenants in its deed of conveyance, it might be liable for a civil penalty of up to $1,000 a day, pursuant to 49 U.S.C.App. § 1471(a) (1982), and could be prohibited from leasing any further property at the Air Park without the FAA's specific approval.

The City petitioned this court for review, asking us to vacate the order of the hearing officer which, by operation of law, has become the final order of the administrator of the FAA. *See supra* note 1. The City contends that the finding by the FAA hearing officer that ten provisions of the lease offered to Brettman were unjustly discriminatory was not supported by substantial evidence on the record and must be set aside. The City also contends that the final order was defective in that it failed to articulate any reasonable basis for concluding that the effect of the City's conduct was to grant an exclusive right to the Beckers.[10] For the following reasons, we

---

dards" and "guidelines" in the leases of the Intervenor.

(c) Transfer of control in the Intervenor's business or property and lease conditions limiting the sale, assignment, and/or sublease of the Intervenor's business or property.

(d) Requirement that the Intervenor comply with minimum standards and future-imposed standards while exempting other lessees from that requirement.

(e) Requiring the disclosure of confidential commercially valuable business information by the Intervenor while exempting other lessees from that obligation.

(f) Requiring the operation by the Intervenor in more than one category under the City's standards for airpark lessees and to operate as a fixed base facility before being able to rent hangar space.

(g) Requiring approval of several City administrative authorities for new construction facilities not required by others.

(h) Discriminatory gasoline tax provisions.

(i) Required deposit by the Intervenor not required of others.

(j) Bankruptcy, lien and rental rate provisions of Intervenor's lease unlike the provisions of other lessees.

10. The City also advances the novel argument that the July 7, 1983 determination by the FAA assistant general counsel, that the lease submitted by the City to the FAA appeared to be reasonable and not unjustly discriminatory, and the stipulation which resulted in the FAA's withdrawal of its Notice should be treated as an administrative consent decree and thus given res judicata effect. Alternatively, the City ar-

gues that the FAA's reissuance of its Notice of Proposed Order on October 27, 1983, was arbitrary and capricious. The City's arguments are meritless.

The agreement by the FAA to withdraw its Notice based on the City's promise to negotiate with Brettman in good faith in no way resembles a consent judgment by a neutral court entered upon a settlement by parties litigating before it. The City cites no legal authority for such a proposition. "The settlement by consent provision is extremely important [in the administrative context] because agencies ought not engage in formal proceedings where the parties are perfectly willing to consent to judgments or adjust situations informally." 3 K. Davis, Administrative Law Treatise § 14.9, at 39 (2d ed. 1980). Precluding an agency from reinitiating formal administrative action against a party who reneges on an informally agreed settlement would discourage an agency from attempting to settle disputes short of formal proceedings and be contrary to the above noted policy.

The doctrine of res judicata has been applied in the administrative context. An administrative decision will be given res judicata effect when "an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate...." *United States v. Utah Construction and Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). *See Pantex Towing Corp. v. Glidewell,* 763 F.2d 1241, 1245 (11th Cir.1985). The administrative decision approved by the Supreme Court in *Utah Construction, supra,* was the result of a full adversary proceeding with

find the City's objections to be without merit.

## II.

### A.

■ Our standard for reviewing the FAA's findings of fact is dictated by statute; "[t]he findings of facts ... by the Secretary of Transportation [here, the Administrator of the FAA], if supported by substantial evidence, shall be conclusive." 49 U.S.C.App. § 1486(e) (1982). *See Blackwell v. Bond,* 619 F.2d 372, 373 (5th Cir. 1980);[11] *Herring v. Administrator, FAA,*

532 F.2d 1003, 1004 (5th Cir.1976); *Stern v. Butterfield,* 529 F.2d 407, 409 (5th Cir. 1976). In reviewing administrative fact findings to determine whether they are supported by substantial evidence, we must look at the record in its entirety, " 'including the body of evidence opposed to the [agency's] view.' " *NLRB v. Southern Florida Hotel & Motel Association,* 751 F.2d 1571, 1579 (11th Cir.1985) (quoting *Universal Camera v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). Substantial evidence supporting the agency's findings exists, if the record reveals

testimony, cross-examination, exhibits, briefs, and argument. *See Nasem v. Brown,* 595 F.2d 801, 807 (D.C.Cir.1979). It follows that an agency proceeding which does not afford an opportunity to present live witnesses or to cross-examine opposing witnesses does not meet the test that the parties were afforded a full opportunity to litigate. *Nasem v. Brown,* 595 F.2d at 807. *See* 4 K. Davis, Administrative Law Treatise § 21.4 (2d ed. 1983).

The July 7 stipulation signed by the FAA and the City was the product of an informal settlement reached at a meeting in a Congressman's office in Washington, D.C. Officials from the City and the FAA gathered to discuss the possibility of whether the dispute could be resolved short of formal adjudicatory proceedings. Brettman, the intervenor, was not present. Nor was there testimony by live witnesses and cross-examination of opposing witnesses. The interested parties in this controversy were not accorded a full opportunity to litigate. Additionally, the writing of a letter, by the assistant general counsel for the FAA, concluding that the City's lease appeared to be reasonable, could hardly be classified as the judicial act of an administrative agency; the counsel's letter was not the result of any formal adversary proceedings, but rather the product of his review of an incomplete document. In conclusion, the events of July 7 cannot be accorded res judicata effect.

The City's alternative argument is equally specious. Even if the FAA's decision to reinitiate formal proceedings against the City constituted the type of informal decision making cited by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the agency's conduct stands the test of judicial review. Judicial review of an informal administrative agency decision focuses first upon whether the administrator acted within the scope of his or her authority, and, second, upon whether the administrator's decision was arbitrary and capricious. *Id.* at 416, 91 S.Ct. at 823. "To make this finding the court must consider whether the decision

was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. at 823–24. Also, to survive judicial review under the arbitrary and capricious standard an agency must explain the rationale for its decision. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Deaton v. Interstate Commerce Commission,* 693 F.2d 128, 131 (11th Cir.1982).

Because the July 7 stipulation is not to be accorded res judicata effect, the FAA's decision to reinitiate formal proceedings against the City was clearly within the Administrator's scope of authority. The agency explained its reasons for reissuing its notice in letters to the City dated September 1, 1983, and October 27, 1983. As the FAA explained, the City was not complying with its agreement to negotiate in good faith the financial terms of the Brettman lease so that they were not unreasonable and unjustly discriminatory when compared to the financial terms of the Becker leases. In addition, the FAA noted that the City had not provided the agency with the full text of the proposed Brettman lease prior to the July 7 stipulation; the City had omitted its minimum standards which were incorporated by reference into the lease and contained a number of provisions that would have placed Brettman in a disadvantageous position when compared to the Beckers. We find the FAA's position to be reasonable and not arbitrary and capricious and uphold its decision to reinstitute formal proceedings against the City.

**11.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

"relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *see also Universal Camera,* 340 U.S. at 477, 71 S.Ct. at 459; *Abilene Sheet Metal, Inc. v. NLRB,* 619 F.2d 332, 337 (5th Cir.1980); *Aircraft Owners & Pilots Association v. FAA,* 600 F.2d 965, 970 (D.C.Cir.1979) (construing 49 U.S.C.App. § 1486(e)). "[We] must decide only whether the agency made a reasonable finding...." *Abilene Sheet Metal, Inc. v. NLRB,* 619 F.2d at 338.

■ A reviewing court should bear two points in mind in applying the substantial evidence test. First, circumstantial evidence in the record may contribute to the substantial evidence supporting an agency's findings. *Sorenson v. National Transportation Safety Board,* 684 F.2d 683, 685 (10th Cir.1982) (construing 49 U.S.C.App. § 1486(e)). Second, we defer to the agency's findings of fact, never " 'displac[ing] the [agency's] choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo.'* " *NLRB v. Southern Florida Hotel,* 751 F.2d at 1579 (quoting *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 465). As a reviewing court, it is not our function to reevaluate the weight of the evidence or to reexamine credibility choices made by the fact finder. *Stern v. Butterfield,* 529 F.2d at 409; *Sorenson,* 684 F.2d at 685; *Air East, Inc. v. National Transportation Safety Board,* 512 F.2d 1227, 1233 (3d Cir.), *cert. denied,* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975) (construing 49 U.S.C.App. § 1486(e)).

■ Next, we must ascertain whether there is a rational connection between the facts found and the decision made by the agency. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *National Wildlife Federation v. Marsh,* 721 F.2d 767, 780 (11th Cir.1983). Courts conducting a review under 49 U.S.C.App. § 1486(e) consistently take this second step in their analyses. Thus, not only must the agency's factual findings be supported by substantial evidence, but the agency's nonfactual analysis, including its interpretation of the governing statute, application of that statute to the facts, and conclusion must also be reasonable and not arbitrary and capricious. *South Dakota v. Civil Aeronautics Board,* 740 F.2d 619, 621 (8th Cir.1984); *Aircraft Owners & Pilots Association,* 600 F.2d at 973; *Rombough v. FAA,* 594 F.2d 893, 896 (2d Cir.1979); *Starr v. FAA,* 589 F.2d 307, 310 (7th Cir.1978); *Air Line Pilots Association International v. Civil Aeronautics Board,* 502 F.2d 453, 457 (D.C.Cir.1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1391, 43 L.Ed.2d 652 and 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 and 420 U.S. 972, 95 S.Ct. 1393, 43 L.Ed.2d 652 and 421 U.S. 988, 95 S.Ct. 1991, 44 L.Ed.2d 477 (1975); *cf. Herring v. Administrator, FAA,* 532 F.2d at 1004 (administrative law judge affirmed when findings were supported by substantial evidence and not based on any erroneous legal theory). "The construction of a statute by an agency charged with its administration is entitled to substantial deference" from the reviewing court. *South Dakota v. Civil Aeronautics Board,* 740 F.2d at 621; *see also White Industries, Inc. v. FAA,* 692 F.2d 532, 534 (8th Cir.1982); *Aircraft Owners & Pilots Association,* 600 F.2d at 973–74; *Rombough v. FAA,* 594 F.2d at 896 n. 6; *cf. Scarborough v. Officer of Personnel Management,* 723 F.2d 801, 806 (11th Cir.1984). Although that court is the final authority on issues of statutory construction, *Frank Diehl Farms v. Secretary of Labor,* 696 F.2d 1325, 1331 (11th Cir.1983), it must respect the agency's findings and conclusions when the question involves an interpretation of a statute that is within the agency's specialized knowledge and expertise. *Id.* at 1329; *Hi-Craft Clothing Co. v. NLRB,* 660 F.2d 910, 915 (3d Cir.1981). This court "will adhere to the 'principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.' " *Veterans Administration Medical Center v. Federal Labor Relations Authority,* 675 F.2d 260, 262

(11th Cir.1982) (quoting *National Federation of Employees, Local 1451 v. Federal Labor Relations Authority*, 652 F.2d 191, 193 (D.C.Cir.1981)); *see also Florida Power and Light Co. v. Federal Energy Regulatory Commission*, 660 F.2d 668, 677 (5th Cir. Unit B 1981), *cert. denied*, 459 U.S. 1156, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).

▇ Here, we are confronted by a statute committed to the FAA for its administration. *See* 49 U.S.C.App. § 1354(a) (1982);[12] 14 C.F.R. §§ 13.1–13.131 (1984). Formerly section 303 of the 1938 Civil Aeronautics Act, section 1349(a) of Title 49 is now a part of the Federal Aviation Act of 1958, the act that established the FAA. H.R.Rep. No. 2360, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Ad. News 3741, 3741–42; *see Hill Aircraft & Leasing Corp. v. Fulton County*, 561 F.Supp. 667, 673 & n. 3 (N.D.Ga.1982), *aff'd*, 729 F.2d 1467 (11th Cir.1984); *Midway Airlines, Inc. v. County of Westchester*, 584 F.Supp. 436, 441 (S.D.N.Y.1984). The FAA is responsible for ensuring compliance with the Federal Aviation Act and its regulations. Section 1349(a) provides ˋgenerally that federal funds may not be expended for the maintenance or operation of air navigation facilities, except upon written recommendation and certification by the Secretary of Transportation or, as the regulations make clear, the Secretary's delegate, the Administrator of the FAA. The statute further provides that "[t]here shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." 49 U.S.C.App. § 1349(a). *See Hill Aircraft*, 561 F.Supp. at 670; *see also Air California v. United States Department of Transportation*, 654 F.2d 616, 618 (9th Cir.1981); *Guthrie v. Genesee County*, 494 F.Supp. 950, 959–60 (W.D.N.Y.1980). Because the City of Pompano Beach has been the recipient of federal funds and

property for its Air Park through various federal aid programs, it is subject to federal prohibitions against unjust discrimination resulting from the grant of an exclusive right. *See City of Dallas v. Southwest Airlines Co.*, 371 F.Supp. 1015, 1026 (N.D.Tex.1973), *aff'd*, 494 F.2d 773 (5th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974); *Alphin v. Henson*, 392 F.Supp. 813, 818 (D.Md.1975), *aff'd*, 538 F.2d 85 (4th Cir.1976), *modified on other grounds*, 552 F.2d 1033 (4th Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 67, 54 L.Ed.2d 80 (1977).

▇ In 1941, the Attorney General of the United States advised that the term "exclusive right," as used in section 303 of the Civil Aeronautics Act of 1938, the predecessor of section 1349(a), "was intended to describe a power, privilege, or other right excluding or debarring another or others from enjoying or exercising a like power, privilege, or right." 40 Op. Att'y Gen. 71, 72 (1941). Construing the legislative history of the predecessor act, the Attorney General opined that "the purpose of the provision is to prohibit monopolies and combinations in restraint of trade or commerce and to promote and encourage competition in civil aeronautics ..." at federally subsidized airports. *Id.* The term "exclusive right for the use of any landing area" does not apply broadly to the total of aeronautical uses to which an airport may be devoted; that would frustrate the purpose of the statute's limitation upon the use of federal funds by permitting mini-monopolies in the various airport activities. *Id.* Rather, "[t]he provision is clearly applicable to any right for the use of a landing area or an airport ... which is exclusive in character," prohibiting the grant of an exclusive right to *each* "particular aeronautical activity." *Id.* at 73. *See Hill Aircraft*, 561 F.Supp. at 673; *City of Dallas,*

---

12. 49 U.S.C.App. § 1354(a) (1982) provides:

**§ 1354. Other powers and duties of Secretary of Transportation**
**(a) Generally**
  The Secretary of Transportation is empowered to perform such acts, to conduct such investigations, to issue and amend such orders, and to make and amend such general or special rules, regulations, and procedures, pursuant to and consistent with the provisions of this chapter, as he shall deem necessary to carry out the provisions of, and to exercise and perform his powers and duties under, this chapter.

371 F.Supp. at 1032; *Niswonger v. American Aviation, Inc.*, 411 F.Supp. 763, 766 (E.D.Tenn.1975), *aff'd*, 529 F.2d 526 (6th Cir.1976). The type of exclusive right prohibited by section 1349(a) has been described as "one of the sort noxious to the anti-trust laws." *Aircraft Owners and Pilots Association v. Port Authority of New York*, 305 F.Supp. 93, 105 (E.D.N.Y.1969).

In a nonregulatory circular to public airport owners, the FAA defined "exclusive right" as follows:

> A power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right may be conferred either by express agreement, *by imposition of unreasonable standards or requirements*, or by any other means. Such a right conferred on one or more parties but excluding others from enjoying or exercising a similar right or rights would be an exclusive right.[13]

FAA Advisory Circular No. 150/5190–2A at 3 (April 4, 1972) (emphasis added). Because "[t]he agency considers that the existence of an exclusive right to conduct any aeronautical activity limits the usefulness of an airport and deprives the using public of the benefits of competitive enterprise," the FAA deems that the grant of an exclusive right at any airport upon which federal funds has been expended is contrary to applicable federal law. *Id.* at 4. *See Niswonger*, 411 F.Supp. at 766–67; *Alphin*, 392 F.Supp. at 828, 832.

We note two cases in which a court has found a violation of the federal prohibition against the grant of an exclusive right at an airport upon which federal funds have been expended. In *City of Dallas v. Southwest Airlines Co.*, 371 F.Supp. 1015 (N.D.Tex.1973), *aff'd*, 494 F.2d 773 (5th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974), the district court concluded that a city ordinance governing the phase-out provisions of Love Field near Dallas that would have allowed continued service at Love Field by certain types of aircraft but required Southwest and other aircraft in Southwest's classification to move to the new Regional Airport constituted unjust discrimination and a grant of an exclusive right of access to some carriers and not to others. The city's explanation for prohibiting Southwest from continuing its operation at Love Field was that it wanted to avoid the potential competitive effect on the regional airport; the district court said this was an insufficient justification. *Id.* at 1030. In *Niswonger v. American Aviation, Inc.*, 411 F.Supp. 763, 769 (E.D.Tenn.1975), *aff'd*, 529 F.2d 526 (6th Cir.1976), a case closely analogous to the case at bar, the district court held that the public airport authority violated federal law by granting an exclusive right to an incumbent fixed base operator. In *Niswonger*, an applicant for a fixed base operator's lease at the airport was denied access to the airport on the grounds that all available land had been leased to the incumbent fixed base operator. The court said that this transaction constituted a violation of federal law, particularly because the lessee, by this device, had acquired control and exclusive use of more area of the airport than it reasonably needed or could be expected to use in conducting its business. *Id.* at 771.

### B.

There is no question that the FAA hearing officer's factual findings are supported by substantial evidence in the record of this

---

13. Echoing and interpreting the language of 49 U.S.C.App. § 1349(a), *see supra* note 2, the FAA qualified its definition of "exclusive right" as follows:

> The presence on an airport of only one enterprise conducting aeronautical activities does not necessarily mean that an exclusive right has been granted. If there is no intent by express agreement, by imposition of unreasonable standards, or by other means to exclude others, the absence of a competing activity is not a violation of this policy. This sort of situation frequently arises where the market potential is insufficient to attract additional aeronautical activities. So long as the opportunity to engage in an aeronautical activity is available to those who meet reasonable and relevant standards, the fact that only one enterprise takes advantage of the opportunity does not constitute a grant of an exclusive right.

FAA Advisory Circular No. 150/5190–2A at 4–5 (April 4, 1972).

case. The hearing officer, in his findings, listed ten differences between the lease the City offered Brettman and the leases it gave the Beckers. The leases and evidence detailing the differences therein were before the hearing officer in the form of testimony and exhibits. The City was on notice prior to the hearing that the leases would be scrutinized and was afforded ample opportunity to cross-examine and challenge any evidence pertaining to the leases.

■ The City argues that the different provisions in the proposed Brettman lease are not unjustly discriminatory *per se.* This is true. But, based upon the evidence in the record, the hearing officer was entitled to find that they were unjustly discriminatory. First, the cited provisions in the lease offered to Brettman are, on their face, disadvantageous to Brettman.[14] Second, Brettman testified about the prejudicial effect of each of the provisions. The hearing officer heard testimony that Brett-man is an experienced aviator and businessman, engaged in the business of developing aircraft hangar facilities at airports; at the time of the hearing, Brettman had constructed hangars at airports in Venice, Daytona Beach, Orlando, and Merritt Island, Florida and was soon to commence such an operation in Jacksonville. The hearing officer, as fact finder, was charged with weighing the evidence and making credibility determinations. It was reasonable for the hearing officer to accept Brettman's testimony that the cited lease provisions would impose an undue hardship upon his proposed business operation at Pompano Beach Air Park, rendering it noncompetitive with the existing fixed base operators. Applying the substantial evidence test, we will not disturb the credibility choices the fact finder has made or reevaluate the weight of the evidence.

■ The hearing officer, relying on his findings that the provisions in the lease

---

**14.** For instance, three of the provisions impose upon Brettman financial obligations which are absent from or less than those imposed by the leases between the City and the Beckers. The City would have Brettman make a minimum investment of $500,000, in return for a thirty-year lease, compared to $200,000 for Pompano Air Center and $100,000 for Bec-Air. The City sought to require a $5,000 deposit at the outset from Brettman, while none was required of either of the Beckers. Finally, the City proposed to require Brettman to pay approximately the same rental rate for unimproved land as it is requiring the Beckers to pay for improved land, including taxi-ways, ramps, and tie-down space which was conveyed to the City by the federal government.

A number of the discriminatory provisions listed by the hearing officer would limit Brettman's control over his business and impede his ability to plan for the future, to secure financing, and to operate on a competitive basis with the Beckers. The City proposed that in order for Brettman to transfer control of more than fifteen percent of the business, he must obtain prior City approval. In contrast, the Beckers' leases permit the Beckers to transfer control of or hypothecate for financing purposes up to fifty percent of their assets without prior City approval. According to the lease the City proposed to Brettman, Brettman would have to comply with the City's current *and* future minimum standards for fixed base operators; the Beckers' leases lock their operations to the City's 1967 minimum standards. The proposed Brettman lease contemplates more extensive prior City approval before any construction could commence than is required of the Beckers, who may commence construction within thirty days absent the City's objection. Bankruptcy and lien provisions in the proposed Brettman lease are also clearly disadvantageous. The City, according to its proposed lease, could terminate the Brettman lease within thirty days of voluntary or involuntary bankruptcy. Additionally, should Brettman be in breach of any of the provisions of his lease, the City could place a lien upon all revenues earned from the leased premises to ensure Brettman's compliance with his lease. This provision is not present in the Beckers' leases. Finally, Brettman would be subject to an escalatory gasoline tax provision not contained in the Beckers' leases that would permit the City, in agreement with *any* one of the Air Park's fixed base operators, to increase its tax of two cents per gallon. Pompano Air Center's lease locks in its gasoline tax at two cents per gallon, while Bec-Air's lease provides that the two cents per gallon tax may be increased only by agreement between the City and *all* of the fixed base operators at the Air Park.

The proposed Brettman lease would impose upon Brettman an onerous requirement to disclose extensive confidential business information, including his projected gross revenues and operating costs for each year of the thirty-year lease term. The Beckers' leases contain no such requirement, and the City has never demanded such information from them.

proposed by the City to Brettman were unjustly discriminatory and that the City's delays in negotiating with Brettman benefited the incumbent lessees, concluded that the City's conduct had the effect of granting the Beckers an exclusive right at its Air Park. This is a reasonable application of the law.

According to the testimony, the Beckers' two businesses at the Air Park were, in essence, one business enterprise. While Pompano Air Center is a fully developed fixed base operator servicing airplanes, Bec-Air, located next door, is little more than a corporate shell. It supplies no service other than gasoline and refers all maintenance work to Pompano Air Center. The two corporations have interlocking officers, with the father and son basically trading positions in the corporate structure of each operation. The senior Becker purchased Executive Aviation in 1981 and created Bec-Air for tax purposes rather than having his existing company absorb the operation. Then he installed his son as the senior officer of Bec-Air, creating the guise of a separate business. Neither Bec-Air nor Pompano Air Center has fully developed all of the land leased from the City; extensive vacant areas remain on their leaseholds. It was reasonable for the hearing officer to conclude that the Beckers' businesses, in combination with each other, comprised the type of unacceptable monopoly Congress intended to prohibit when it enacted section 1349(a).

■ True, there was no evidence that the City by express agreement gave the Beckers an exclusive right to provide services to fixed-wing aircraft at the Air Park; witnesses questioned whether such an agreement existed flatly denied the proposition. But an exclusive right may also be created by imposing on outsiders unreasonable standards or requirements. The lease the City offered Brettman, when compared to the leases it has given the Beckers, made it virtually impossible for Brettman or any applicant for that matter to start a similar business at the Air Park and to compete with the Beckers. This is not a case where the existence of only one enterprise conducting a particular aeronautical activity at an airport is acceptable because the market potential is insufficient to attract competitors, *see supra* note 13; the City had an entrepreneur actively seeking to do business at the airport and representing that he had investors willing to utilize his proposed facilities. At least in Brettman's mind a potential market existed to sustain a competing fixed-wing aircraft service center. The potential competitive effect of Brettman's operation upon the Beckers' business was an insufficient reason to deny access to Brettman. *See City of Dallas*, 371 F.Supp. at 1030. Instead of making its public airport available to the benefits of competitive enterprise, the City foreclosed, by imposing unreasonable standards and requirements, the opportunity for others to enjoy the rights and privileges held by the Beckers.

■ The City attempted to justify each of the discriminatory provisions in the proposed Brettman lease, arguing that they were incorporated to protect the City's and thus the public's interest. These justifications, which might have provided an adequate reason for the City's modification of its standard fixed base operator lease over time, were insufficient here, in light of the City's conduct vis-a-vis Brettman. Key to our affirmation of the hearing officer's findings and order is the fact that the City's contemporaneous treatment of the Beckers and Brettman differed so markedly. The City last amended its lease with John Becker and Pompano Air Center in November 1978; Brettman applied for a lease May 30, 1979; the City granted Executive Aviation a lease in July 1979; and the City then granted Brian Becker a lease in November 1981. The differences in these leases have already been noted; we find no reasonable explanation or justification in the record as to why they exist. Contrary to the City's foreboding warning and admonition, our affirmance of the hearing officer's findings and order is *not* a signal to cities and potential lessees of municipal property that all municipal leases must be identical. We applaud a city's desire to learn from experience and to be ever watchful for improvements in the way it

does business in order to protect the public's interest; modifications in standard contracts and leases is one way to accomplish this worthy goal. But in this instance the clock stopped for the City of Pompano Beach on May 30, 1979, the date of Brettman's initial request. Any modifications in the lease the City extends to Brettman must be reasonable when compared to similar leases offered by the City to others *at that time or subsequent thereto.* The FAA has construed the statute prohibiting the grant of an exclusive right at a federally subsidized airport and has acted here in accordance with the proper interpretation of the law. We find no indication that the FAA's application of the law was incorrect.

For the foregoing reasons, the FAA's order, requiring the City to offer Brettman a lease with "terms, conditions, and requirements substantially identical" to those in the leases held by the Beckers, is

AFFIRMED.

JOHN R. BROWN, Circuit Judge, dissenting:

Despite the majority's insistence that we do not trench upon a municipality's right to determine—in the light of time and changed economics and municipal policies—changes in controlling policies, that is the effect of this decision. What happened years ago; how someone was treated years ago; what factors were thought significantly relevant years ago cannot be the measure against which to determine today's decision. To hold otherwise is to deny life in which for children, for adults, for government, for society we learn from the past and, learning, adapt the lessons of the past to the future.

I therefore respectfully dissent.