The **INTERFACE GROUP, INC.,** Plaintiff,

v.

**MASSACHUSETTS PORT AUTHORITY,** Defendant.

Civ. A. No. 84–4065–C.

United States District Court, D. Massachusetts.

March 31, 1986.

Richard J. Innis, James C. Burling, David Millon, Hale & Dorr, Boston, Mass., for plaintiff.

Scott P. Lewis, and Daniel O. Mahoney, Palmer & Dodge, Paul Johnson, and Richard J. Lettieri, Boston, Mass., for defendant.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a civil action brought by the Interface Group, Inc. ("Interface"), a Massachusetts corporation with its principal place of business in Needham, Massachusetts, against the Massachusetts Port Authority ("Massport"). Interface brought this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, seeking injunctive relief against threatened loss or damage by reason of Massport's alleged violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Interface also seeks damages and injunctive relief under the Federal Aviation Act, 49 U.S.C. § 1349, the Federal Anti-Head-Tax Act, 49 U.S.C. § 1513, and the Airport and Airway Improvement Act of 1982, 49 U.S.C. § 2210. Lastly, Interface seeks damages and injunctive relief under Mass.Gen.Laws Ann. chs. 93 and 93A, requesting this Court to exercise jurisdiction over these claims by virtue of the doctrine of pendent jurisdiction.

The matter is now before the Court on the defendant Massport's motion to dismiss the complaint, filed pursuant to Fed.R. Civ.P. 12(b)(1) and 12(b)(6). The defendant moves to dismiss Counts I and II, the federal antitrust law claims, on the grounds that those claims are barred by the state action doctrine and that, if they are not so barred, they should be dismissed because the complaint fails to sufficiently allege illegal monopolization or an illegal agree-

ment in restraint of trade. The defendant also moves to dismiss Counts V, VI, and VII of the complaint, the federal aviation law claims, contending that those claims are barred because there is no express or implied right of action under the federal aviation laws and, if they are not barred on that ground, the claims should be dismissed because Interface has failed to allege sufficient facts to state claims under those laws. Lastly, the defendant requests that the Court refuse to exercise pendent jurisdiction over the plaintiff's state law claims, but if the Court should exercise jurisdiction over those claims, the defendant argues that the state law claims also should be dismissed as a matter of law.

This case raises important and difficult questions concerning the amenability to suit of Massport and similar entities under the federal antitrust and aviation laws. After careful consideration of the ably presented arguments on behalf of both parties, I rule that Interface's federal antitrust law claims in Counts I and II should be dismissed on the basis of the state action doctrine; that Interface's claims in Counts V, VI, and VII under the federal aviation laws should be dismissed for lack of an express or implied right of action under those laws; and that Interface's state antitrust claim under Chapter 93 of the Massachusetts General Laws in Count III should be dismissed because, under Massachusetts law, any activities exempt from the federal antitrust laws are also exempt from the state antitrust laws and, as stated above, Interface's claims under the federal antitrust laws are barred by the state action doctrine. Finally, the Court declines to exercise its discretionary pendent jurisdiction over Interface's claim under Chapter 93A of the Massachusetts General Laws.

In deciding this motion to dismiss, the Court has taken all of the allegations of the complaint to be true and has viewed them in the light most favorable to Interface. *O'Brien v. DiGrazia*, 544 F.2d 543, 545 (1st Cir.1976). The Court recognizes that it would be improper to dismiss any of Interface's claims "unless it appears beyond doubt that [Interface could] prove no set of facts which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

The complaint alleges that, on October 22, 1984, Interface entered into agreements with Trans World Airlines ("TWA") pursuant to which Interface purchased from TWA two L–1011 aircraft (the "aircraft") for a total price of $21 million. Under the agreements, TWA leased back the aircraft from Interface for six months out of every year, May through October, during which period the aircraft were to be operated as part of TWA's regular fleet. During the remainder of the year, November through April, Interface was to use the planes for high-quality, low-cost, regularly scheduled charter flights, primarily between Boston and the Carribean area. The lease has a seven-year term. Interface and TWA also agreed that TWA would provide year-round maintenance, ground service, passenger service, and fueling to the aircraft at Logan Airport in Boston, and that TWA would utilize TWA's facilities, located at Terminal C, in servicing the aircraft.

This arrangement, the complaint alleges, promised to yield significant efficiencies. Use of TWA's ground services facilities and experienced personnel allegedly would allow Interface to obtain superior service at lower cost than could be obtained from the two fixed-base operators ("FBOs") servicing non-tenant airlines' planes at Terminal E. The arrangement would also enhance TWA's operating efficiency by allowing TWA to liquidate part of its huge capital investment, to adjust to the seasonal nature of the demand for its product, to retain seasonal use of the aircraft during its peak season, and to increase use of its terminal and ground services capacity during the off-peak season, when Interface was to operate the aircraft. At the same time, TWA would retain the assurance that its own ground services facilities would be maintaining the aircraft not only while operated by TWA, but throughout the year, in a manner that TWA knows to be safe and cost-effective. This provision of the agreement, the complaint alleges, is partic-

ularly important because the aircraft requires special servicing equipment and specially-trained servicing personnel. The end result of Interface's efficiency-enhancing arrangement, according to the complaint, would be increased consumer welfare in the form of lower prices, greater safety, and higher quality service for airline customers.

The complaint further alleges that Massport, which has a monopoly on commercial airports in the Greater Boston area, has imposed restrictions on TWA and Interface that injure competition both in the market for ground services to commercial flights from Logan Airport and in the market for charter and other flights from Logan Airport to vacation destinations. These restraints also allegedly frustrate the purpose and viability of Interface's arrangement with TWA.

According to Interface, Massport has refused to allow Interface to use TWA's facilities at Terminal C, insisting that Interface use Terminal E instead. Interface therefore cannot use TWA's ground services at Terminal C and is forced to use the services provided by the two FBOs at Terminal E. All of TWA's maintenance equipment, spare parts, maintenance personnel, and service manuals are located at TWA's facilities at Terminal C. The complaint alleges that the FBOs lack the specialized equipment and specially-trained personnel necessary to maintain the aircraft safely and efficiently. In addition to impeding Interface's access to TWA's ground services, Massport has given the FBOs the exclusive right to fuel all non-tenant aircraft.

None of these requirements, Interface argues, are necessitated by any legitimate need of Massport. According to Interface, many other major airports in the United States allow tenant airlines, such as TWA, to perform ground services for the non-ten-ant airlines at the tenant airlines' own terminals; moreover, the complaint alleges that Massport permits tenant airlines with terminal space at Logan Airport to operate their own charter flights from such terminals.

The economic impact on Interface, if it can operate at all under the constraints imposed by Massport, will be approximately $10 per passenger flown, or approximtely $7,000 per in-season day, $35,000 per in-season week, and more than $5,000,000 over the seven-year term of the arrangement with TWA. The $10 additional per passenger expense to Interface will arise largely from per passenger fees imposed by Massport on flights originating from Terminal E, but not on those originating from Terminal C, and from the additional cost of having ground services provided by TWA at Terminal E.

### The Federal Antitrust Law Claims

Counts I and II of the complaint, respectively, allege that Massport's acts constitute monopolizing, attempting to monopolize, and conspiring to monopolize in violation of § 2 of the Sherman Act,[1] and that Massport's exclusive agreements with the FBOs constitute contracts and conspiracies in restraint of trade in violation of § 1 of the Sherman Act.[2] Massport seeks dismissal of the plaintiff's federal antitrust claims on the grounds that they are barred by the state action doctrine established in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

In *Parker v. Brown,* the United States Supreme Court addressed the question whether the federal antitrust laws prohibited a state, in the exercise of its sovereign powers, from imposing certain anticompetitive restraints. *Id.* at 350–52, 63 S.Ct. at 313–14. These restraints took the form of a "marketing program" adopted by the

---

1. "Every person who shall monpolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a misdemeanor ..."
15 U.S.C. § 2

2. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ..."
15 U.S.C. § 1

State of California for the 1940 raisin crop, which prevented the plaintiff from freely marketing his crop in interstate commerce. The Supreme Court noted that California's program "derived its authority ... from the legislative command of the state" and went on to hold that the program was therefore exempt, by virtue of the Sherman Act's own limitations, from antitrust attack:

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

*Id.* at 350–351, 63 S.Ct. at 313.

In a line of cases since its seminal decision in *Parker,* the Supreme Court has expanded, and attempted to define the outer limits of, the state action doctrine. *E.g., Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984); *Town of Hallie v. City of Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Southern Motor Carriers Rate Conference, Inc. v. United States,* —— U.S. ——, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985); and others. The Supreme Court has made it clear in these cases that the state action doctrine does not operate only to exempt from the antitrust laws the states as sovereigns, but in certain circumstances it may also exempt political subdivisions of states and private parties acting pursuant to state authority. For example, in *City of Lafayette v. Louisiana Power & Light Co.,* a plurality of the Supreme Court held that political subdivisions of a state acting "pursuant to state policy to displace competition with regulation or monopoly public service" are protected by the state action doctrine. *City of Lafayette,* 435 U.S. at 413, 98 S.Ct. at 1137. In an attempt to elaborate upon its holding that cities may be exempt if their actions are taken pursuant to state policy, the plurality stated that "an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.'" *Id.* at 415, 98 S.Ct. at 1138, *quoting* Court of Appeals opinion in *City of Lafayette.*

In *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* a case in which a private party claimed state action exemption, the Supreme Court said that cases decided since *Parker* had established a two-pronged test for antitrust immunity: "[f]irst, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy;' [and,] [s]econd, the policy must be 'actively supervised' by the State itself." *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943, *quoting City of Lafayette* 435 U.S. at 410, 98 S.Ct. at 1135 (1978) (plurality opinion by Brennan, J.). Applying this test in *Community Communications v. City of Boulder,* the Supreme Court held that Colorado's Home Rule Amendment to its Constitution, conferring on municipal governments general authority to govern local affairs, did not constitute a "clear articulation" of a state policy to authorize anticompetitive conduct with respect to the regulation of cable television in the locale. *City of Boulder,* 455 U.S. at 55–56, 102 S.Ct. at 842–43. Since the plaintiffs did not satisfy the first prong of the two-prong *Midcal* test, the Supreme Court declined to address the question whether municipalities must satisfy the active state

supervision requirement. *Id.* at 56 n. 10, 102 S.Ct. at 56 n. 20. In *Town of Hallie v. City of Eau Claire,* the Supreme Court squarely addressed this issue and held that municipalities claiming the state action exemption need not satisfy the active state supervision requirement. *Town of Hallie,* 105 S.Ct. at 1720. In support of this holding the Supreme Court reasoned that where a private party is engaging in anticompetitive activity, there is a real danger that it is acting to further its own interests rather than the interests of the state, but the same danger does not exist where a municipality is restraining competition. *Id.* at 1720–1721.[3]

Plaintiff Interface argues that Massport is not a municipality and, accordingly, to gain exemption from the federal antitrust laws in this case, Massport must meet the active state supervision requirement.[4] Massport, on the other hand, argues that it is a municipality and, therefore, to gain state action exemption it only needs to show that it acted pursuant to a state policy to displace competition with regulation. Since Massport clearly is a public entity, akin to a municipality, and clearly is not a private party, I rule that to gain state action exemption, it is sufficient if Massport can show that its alleged actions in this case were taken pursuant to a " 'clearly articulated and affirmatively expressed' state policy to displace competition with regulation" of commercial air travel in the Greater Boston area. *Town of Hallie,* 105 S.Ct. at 1719, *quoting City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138.

In the legislation that created Massport, the Massachusetts General Court (the "Legislature") expressly provided that Massport was to be a "body politic and corporate", consisting of "seven members all of whom shall be appointed by the governor." Mass.Gen.Laws Ann. ch. 91 App.,

§ 1–2. The legislation further provided that Massport was to be a "public instrumentality ... [whose] powers ... shall be deemed and held to be the performance of an essential governmental function." *Id.* The Supreme Judicial Court of Massachusetts, in explaining the nature of Massport, said that while Massport has many important attributes of a corporation "it is in no sense a private or business corporation" and "[o]nly the public is to be benefitted" by its existence. *Opinion of the Justices,* 334 Mass. 721, 734 (1956). The Massachusetts high court went on to state unequivocally that it regarded Massport "as a purely public corporation for public purposes— an *arm of the State* —analogous to a *municipal corporation.*" *Id.* at 735 (emphasis added). In *E.W. Wiggins Airways, Inc. v. Massachusetts Port Auth.,* 362 F.2d 52, 55 (1966), the Court of Appeals for the First Circuit found no merit in the plaintiff's contention that "in operating Logan airport [Massport was] engaged in a purely proprietary capacity and [was] conducting a private business."

The most difficult issue raised by Massport's claim of state action exemption is whether Massport's actions, as alleged in the complaint, were taken pursuant to a " 'clearly articulated and affirmatively expressed' state policy to displace competition with regulation" of commercial airports in the Greater Boston area. *Town of Hallie,* 105 S.Ct. at 1719, *quoting City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138. In *Town of Hallie,* the Supreme Court considered how clearly a state policy in favor of regulation must be articulated for a muncipality to be able to establish that its anticompetitive activity constitutes state action. *Town of Hallie* was a case in which unincorporated Wisconsin townships brought a federal antitrust action against

---

**3.** In *Corey v. Look,* 641 F.2d 32, 36–37 (1st Cir.1981), decided before *Town of Hallie,* the Court of Appeals for the First Circuit held that to be entitled to the state action exemption the Town of Falmouth had to satisfy the "active supervision" requirement. In light of *Town of Hallie,* that is no longer the law.

**4.** In *Southern Motor Carriers Rate Conference, Inc. v. United States,* —— U.S. ——, 105 S.Ct. 1721, 1728, 85 L.Ed.2d 36 (1985), the Supreme Court held that private parties claiming the state action exemption must meet both prongs of the *Midcal* test.

the City of Eau Claire, contending that the city had violated the Sherman Act by acquiring a monopoly over the provision of sewage treatment services and by tying the provision of such services to the provision of sewage collection and transportation services. *Town of Hallie*, 105 S.Ct. at 1715–1716. The city claimed state action exemption. *Id.* In holding that the city was exempt under the state action doctrine, the Supreme Court rejected the townships' argument that for a municipality to gain exemption under the state action doctrine a state legislature must "expressly state in a statute or its legislative history that it intends for the delegated action to have anticompetitive effects." *Id.* at 1719. Requiring such express language, the Supreme Court said, would embody "an unrealistic view of how legislatures work and how statutes are written", have "detrimental side effects upon municipalities' local autonomy and authority to govern themselves", and "embroil the federal courts in the unnecessary interpretation of state statutes." *Id.* and n. 7. The Supreme Court stated that it is sufficient for the party claiming exemption to show that " 'the legislature contemplated the kind of action complained of.' " *Id., quoting City of Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138.

In *Southern Motor Carriers Rate Conference v. United States*, ⸺ U.S. ⸺, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), decided the same day as *Town of Hallie*, the Supreme Court elaborated upon the requirement that the challenged restraint must be pursuant to a clearly articulated state policy.[5] The Supreme Court stated that the first prong of the *Midcal* test is satisfied "[a]s long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure." *Southern Motor Carriers*, 105 S.Ct. at 1731. The Court made it clear that the party claiming exemption need not " 'point

to a specific, detailed legislative authorization for its challenged conduct.' " *Id., quoting City of Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138. Relying upon language in the First Circuit Court of Appeals' decision in *Corey v. Look*, 641 F.2d 32, 37 (1st Cir.1981), Interface argues that to satisfy the first prong of the *Midcal* test Massport must show that its conduct was "necessary to the successful operation of the legislative scheme that the state as sovereign has established." The Supreme Court squarely rejected that notion in *Southern Motor Carriers*, holding that "state action immunity is not dependent on a finding that an exemption from the federal antitrust laws is 'necessary' ". *Southern Motor Carriers*, 105 S.Ct. at 1727 n. 21.

■ An examination of the legislation creating Massport shows that the Legislature clearly intended to displace competition in commercial air transportation in the Greater Boston area with a regulatory structure, and that the legislature intended Massport to act as the arm of the state in administering the regulatory structure. The Legislature expressly stated that "the possession of the airport properties shall be transferred to [Massport] and there shall be vested in [Massport] the control, operation and maintenance of the airport properties and all rents, tolls, charges and revenues pertaining thereto ..." Mass.Gen. Laws Ann. ch. 91 App., § 1–5. The Legislature confirmed the breadth of Massport's authority when it empowered Massport "to contract with any person, partnership, association or corporation desiring the use of any part of [Logan Airport] and its approaches and appurtenances for any proper purpose, and to fix the terms, conditions, rents and rates or charges for such use...." Mass.Gen.Laws Ann. ch. 91 App., § 1–14. Massport was also authorized to "operate ... and ... establish rules and regulations for the use of [Logan airport]...." Mass.Gen.Laws Ann. ch. 91

**5.** In *Southern Motor Carriers* the Supreme Court held that *private* parties are exempt from the federal antitrust laws only if both prongs of the two-pronged *Midcal* test are satisfied. *Southern Motor Carriers*, 105 S.Ct. at 1728. Although

*Southern Motor Carriers* involved private parties, it is beyond question that the Court's discussion of the first prong of the *Midcal* test is apposite to cases in which *public* entities claim state action exemption.

App., § 1–3(g).[6] These statutes "clearly contemplate" that Massport may engage in anticompetitive conduct, and that Massport's alleged conduct in this case is a "foreseeable result of empowering" Massport to contract with any corporation desiring to use Logan Airport and to fix the terms, conditions, rents, and charges for such use. *See Town of Hallie*, 105 S.Ct. at 1718.[7] Accordingly, Counts I and II of the complaint, brought under the federal antitrust laws, should be dismissed because the state action exemption applies to Massport. The Court therefore need not consider Massport's contention that Interface has failed to allege sufficient facts to state claims under the federal antitrust laws.

### The Federal Aviation Law Claims

Interface also alleges that Massport's refusal to permit Interface access to Logan Airport facilities on reasonable and nondiscriminatory terms violates the federal aviation laws, including the Federal Aviation Act of 1958, 49 U.S.C. § 1349, the Federal Anti-Head-Tax Act, 49 U.S.C. § 1513, and the Federal Airport and Airway Improvement Act of 1982, 49 U.S.C. § 2210. None of these statutes expressly creates private remedies for air carriers such as Interface. Interface can maintain these claims, however, if a private right of action is implicit in these statutes. *See e.g., Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944). The central inquiry in determining whether an implied right of action exists under a particular statute is whether Congress intended to create one. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S.

560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). In *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), the United States Supreme Court listed four factors that courts should consider in determining whether Congress intended to create a private right of action:

1) Is the plaintiff "one of the class for whose especial benefit the statute was enacted"—that is, does the statute create a federal right in favor of the plaintiff?

2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one?

3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

4) Is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

In Count V of the complaint, Interface seeks damages and injunctive relief, alleging that Massport's actions constitute a violation of the Federal Aviation Act of 1958, 49 U.S.C. § 1349(a). Section 1349(a) provides in pertinent part:

No Federal funds, other than those expended under this chapter, shall be expended ... for the acquisition, establishment, construction, alteration, repair, maintenance, or operation of any landing area, or for the acquisition, establishment, construction, maintenance, or operation of air navigation facilities thereon, except upon written recommendation and certification by the Secretary of Transportation that such landing area or facility is reasonably necessary for use in air commerce or in the interests of national defense.... [t]here shall be no exclusive right for the use of any landing area

---

**6.** The Legislature added the general provision that:

"This act, being necessary for the welfare of the [C]ommonwealth and its inhabitants, shall be liberally construed to effect the purposes thereof."

Mass.Gen.Laws Ann. ch. 91 App., § 1–27.

**7.** In *Massachusetts Furniture & Piano Movers Ass'n, Inc. v. F.T.C.*, 773 F.2d 391 (1st Cir.1985), the Court of Appeals for the First Circuit determined the Legislature's intent to displace competition with regulation, as the Supreme Court had done in *Southern Motor Carriers*, solely from the language of the state's statute. *Id.* at 395–96.

or air navigation facility upon which Federal funds have been expended....

■ There is no express private right of action under § 1349(a) and, for the following reasons, I rule that a right of action should not be implied. In applying the *Cort* test, the first factor to consider is whether Interface is "one of the class for whose especial benefit the statute was enacted." *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088. That question is answered by looking at the language of the statute itself. *Cannon v. University of Chicago*, 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). The language of § 1349(a) does not explicitly confer an especial benefit on aircraft owners such as Interface. To the contrary, § 1349(a) was intended to benefit the general public and to monitor how federal funds are spent. *Accord Hill Aircraft & Leasing Corp. v. Fulton County*, 561 F.Supp. 667, 673 (N.D.Ga.1982). *Guthrie v. Genesee County*, 494 F.Supp. 950, 959 (W.D.N.Y.1980).

Turning to the second *Cort* factor, Interface has not directed this Court's attention to any legislative history evidencing an intent to create a private right of action under § 1349(a). Since § 1349(a) by its own language does not appear to be for the especial benefit of aircraft operators, the fact that the legislative history is silent as to whether Congress intended to create a private cause of action under § 1349(a) supports the conclusion that Congress did not intend to create one. *See Touche Ross*, 442 U.S. at 571, 99 S.Ct. at 2486.

Furthermore, it is significant that Congress enacted an extensive administrative and judicial enforcement procedure that did not include a private right of action for violations of § 1349(a). *See* 49 U.S.C. §§ 1354, 1471 *et seq.* This enforcement scheme provides that any individual who is harmed by a violation of § 1349 may file a complaint with the Secretary of Transportation or the Civil Aeronautics Board, who are authorized to issue orders to enforce the provisions of the Act. 49 U.S.C. §§ 1354, 1485. The Secretary or the Board may petition a federal district court for judicial enforcement of the Act. 49 U.S.C. § 1487. The Act not only provides an enforcement procedure for violations of § 1349(a), but provides for civil penalities as well. 49 U.S.C. § 1471. The Supreme Court of the United States has expressly recognized as "an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it," *Transamerica*, 444 U.S. at 19, 100 S.Ct. at 247, because, in light of those remedies, "it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action'". *Id.* at 20, 100 S.Ct. at 247, *quoting Cannon*, 441 U.S. at 742, 99 S.Ct. at 1981 (Powell, J., dissenting).

Massport correctly points out, as an additional indication that Congress did not intend to create a private right of action under § 1349(a), that Congress expressly provided a private right of action for violations of another provision of the Act, but failed to do so for § 1349(a). Section 1487 provides that "any party in interest" may sue in the district courts for violations of § 1371(a), which precludes air carriers from engaging in air transportation without certification. The express provision of a private right for violations of § 1371(a) and the omission of an express private right of action for violations of § 1349(a) "strongly suggests" that Congress did not intend to create such a right under § 1349(a). *See Transamerica*, 444 U.S. at 11, 100 S.Ct. at 242. In light of the fact that Congress expressly created a private remedy for violations of § 1371(a), it seems obvious that "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross*, 442 U.S. at 572, 99 S.Ct. at 2487.

Since an analysis of the first two factors of the *Cort* test clearly indicates that Congress did not intend to create a private cause of action under § 1349(a), the Court need not lengthily consider the third and fourth factors. *See Touche Ross*, 442 U.S. at 575, 99 S.Ct. at 2488–89. The Court

notes, however, with respect to the third factor—whether a private cause of action is necessary to effectuate the purposes of § 1349(a)—that there is in fact an extensive enforcement scheme, as described above, for § 1349(a). Although the fourth factor favors Interface's position, in light of the Court's evaluation of the first three factors of the *Cort* test, I rule that the fourth factor is entitled to little weight. Since I rule that Interface does not have a private right of action under § 1349(a), it is unnecessary to consider Massport's contention that the complaint fails to allege sufficient facts to state a viable claim under the statute.[8]

▆ In Count VI Interface claims that Massport has violated the Federal Anti-Head-Tax Act, 49 U.S.C. § 1513, which provides in relevant part:

(a) No State ... shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom....

(b) Except as provided in subsection (d) of this section, nothing in this section shall prohibit a State ... owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities.

Section 1513 does not provide an express private right of action and, for the reasons discussed below, I rule that there is no implied right of action.

Interface argues that an "unbroken series of cases"[9] which permit carriers to mount challenges under Section 1513 ... compels the conclusion that a private right of action under Section 1513 does exist", and, therefore, "this court need not undertake an analysis of the *Cort* factors" to determine whether Interface has a private right of action under § 1513.[10] Nothing in the cases cited by Interface compels the conclusion that it has an implied right of action under § 1513; in fact, none of the cases cited addresses whether there is an implied right of action under § 1513. For example, the question decided by the Supreme Court of the United States in *Aloha Airlines Inc. v. Director of Taxation of Hawaii*, was whether § 1513 pre-empted a Hawaii state statute[11] that imposed a four percent gross income tax on airlines. *Aloha Airlines*, 464 U.S. 7, 8, 104 S.Ct. 291, 292, 78 L.Ed.2d 10 (1983). That case was initially brought by the plaintiff airline to recover tax refunds on the grounds that the state statute was in conflict with the Commerce Clause and the Supremacy Clause of the United States constitution; it was not brought pursuant to § 1513. *Matter of Aloha Airlines, Inc.*, 65 Hawaii 1, 647 P.2d 263 (1982).

---

8. In *IFC Aviation, Inc. v. The Massachusetts Port Authority*, Civil Action No. 84–1945–T, slip. op. at 1–2, citing *Guthrie* and *Hill Aircraft*, Judge Tauro ruled that § 1349(a) does not create a private right of action. Interface cites two cases in support of its position—*Niswonger v. American Aviation, Inc.*, 411 F.Supp. 763 (E.D.Tenn. 1975), *aff'd without opinion*, 529 F.2d 526 (6th Cir.1976) and *Lehigh v. The Pittston Co.*, 456 A.2d 355 (Me.1983). Notwithstanding that the court in *Niswonger* denied a motion to dismiss a claim made under § 1349(a), that case is not strong support for Interface's position because the district court simply ruled that a complaint for a declaration voiding a lease which allegedly violated § 1349 stated a cognizable claim, not that Congress intended to create a private right of action under § 1349. Moreover, the district court's opinion was rendered before the Supreme Court's decision in *Cort v. Ash*. *Lehigh* is also inapposite because, like the district court in

*Niswonger*, the Supreme Court of Maine did not address the question whether Congress intended to create a private cause of action under § 1349.

9. The "unbroken series of cases" Interface cites consists of four cases: *Aloha Airlines, Inc. v. Director of Taxation of Hawaii*, 464 U.S. 7, 104 S.Ct. 291, 78 L.Ed.2d 10 (1983); *Indianapolis Airport Authority v. American Airlines, Inc.* 733 F.2d 1262 (7th Cir.1984); *Island Aviation, Inc. v. Guam Airport Authority*, 562 F.Supp. 951 (D.Guam 1982); and *American Airlines, Inc. v. City of Philadelphia*, 414 F.Supp. 1226 (D.C.Pa. 1976).

10. Plaintiffs Memorandum in Opposition to Defendant's Motion to Dismiss, pp. 24–25.

11. Haw.Rev.Stat. §§ 239–6 (1976).

In *Indianapolis Airport Authority v. American Airlines, Inc.*, 733 F.2d 1262, 1264–65 (7th Cir.1984), the airport authority, a governmental authority established pursuant to Indiana law, brought an action under a state statute permitting the authority to assess "reasonable" charges for facilities and services within its district to collect fees from the defendant airlines. Since there were no cases defining reasonableness under the Indiana statute, the Court of Appeals for the Seventh Circuit considered § 1513 and its history to give meaning to the word "reasonable", explaining that the court could "assume that what is unreasonable under the federal act (§ 1513) is also unreasonable under the state act ... [and that], in any event, if there is a clash, the federal act must of course prevail." *Id.* at 1265. Unlike the instant action, *Indianapolis Airport Authority* was brought under a state statute, not § 1513, and whether a private cause of action exists under § 1513 was not an issue considered by the Court of Appeals for the Seventh Circuit. In the last two cases cited by Interface, *Island Aviation, Inc. v. Guam Airport Authority*, 562 F.Supp. 951 (D.Guam 1982) and *American Airlines, Inc. v. City of Philadelphia*, 414 F.Supp. 1226 (D.C.Pa.1976), the District Courts merely assumed without analysis that the plaintiff private airlines in those cases had a private cause of action under § 1513. *But see Note, Airline Deregulation and Airport Regulation*, 93 Yale L.J. 319, 324 n. 33 (1983) (stating that "the wisdom of this assumption is doubtful").

An analysis of the four factors set forth in *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2088, and explained in subsequent Supreme Court cases reveals that a private remedy is not implicit in § 1513 and, therefore, Interface's claim under that section should be dismissed. What must be ultimately decided, and what consideration of the four *Cort* factors was intended to aid courts in deciding, of course, is "whether Congress intended to create the private remedy asserted." *Transamerica*, 444 U.S. at 15–16, 100 S.Ct. at 245. With respect to the first *Cort* factor, to determine whether Interface is a member of the class for whose especial benefit § 1513 was enacted the Court must look to the language of § 1513 itself. *Cannon*, 441 U.S. at 689, 99 S.Ct. at 1953. In other words, the Court must consider whether § 1513 explicitly conferred an especial benefit directly on a class that Interface is a member of, or, conversely, whether § 1513 was enacted primarily for the protection of the general public. *Id.* at 690 n. 13, 99 S.Ct. at 1954 n. 13.

Section 1513(a) prohibits a state from taxing "persons travelling in air commerce or ... the carriage of persons travelling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom." Section 1513(b) provides, however, that "nothing in this section shall prohibit a State ... from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities". It certainly is not clear from the words "carriage of persons travelling in air commerce or ... the sale of air transportation or ... the gross receipts derived therefrom" in § 1513(a) that aircraft operators were the "intended, primary" beneficiaries of § 1513. *See Cohen v. Massachusetts Bay Transportation Authority*, 647 F.2d 209, 212 (1st Cir.1981). Moreover, the fact that Congress specifically identified in § 1513(a) "persons travelling in air commerce," who, as discussed below, the legislative history clearly reveals were the intended beneficiaries of the statute, and that § 1513(b) specifically mentions "aircraft operators" shows that Congress knew how to identify aircraft operators in § 1513(a) if it had wanted to do so. This case is different from those where the language of the statute explicitly confers a right directly on a class of persons which includes the plaintiffs. *E.g., Cannon*, 441 U.S. at 681–682, 99 S.Ct. at 1949–50 ("No person in the United States shall, on the basis of sex, ... be subjected to discrimination ..."—20 U.S.C. § 168(a)); *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) ("[N]o person shall be denied the right to vote ..."—42

U.S.C. § 1973c); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) ("All citizens of the United States shall have the same right ... as is enjoyed by the white citizens thereof ..."—42 U.S.C. § 1982).

Section 1513(b)'s reference to "aircraft operators" likewise does not serve to bolster the plaintiff's position. Section 1513(a) is a prohibition against taxing activities by the states while § 1513(b) operates to define and limit the prohibition in § 1513(a). Section 1513(b) essentially provides that, notwithstanding § 1513(a), states may levy and collect certain taxes and, in addition, may collect reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities. The only plausible inference that can be drawn from reading this clause is that the states were the class Congress intended to benefit when enacting § 1513(b), not aircraft operators. A statute providing that states may impose charges, albeit reasonable ones, on aircraft operators for the use of state owned and operated airport facilities clearly is not for the benefit of aircraft operators.

With respect to the second factor of the *Cort* test, an examination of the legislative history of § 1513 reveals no indication of legislative intent, explicit or implicit, to create a remedy on behalf of a class of which Interface is a member. The legislative history clearly shows, and the Supreme Court in *Aloha Airlines*, 464 U.S. at 9, 104 S.Ct. at 292–93, acknowledged, that Congress enacted § 1513 to alleviate the burden of local taxes on air travelers, i.e., on the public. The statute was intended to remedy the "new, inequitable, and potentially chaotic burden of taxation on the nearly 200 million persons who use air transportation each year." S.Rep. No. 93–12, 1973 U.S.Code Cong. & Ad.News 1446. Congress enacted § 1513 as a response to its concern that local head taxes had created "confusion, delay, anger and resentment and cut[ ] against the grain of the traditional American right to travel among the States unburdened by travel taxes." *Id.* The legislative history is replete with references to how state taxes burden "air travelers," the "people", "air passengers," and "citizen[s]". *See, e.g., id.* at 1450. The legislative history, which shows that in enacting § 1513 Congress was solely concerned with the adverse effects local taxes were having on the public's right to travel, militates strongly against the position that a private remedy on behalf of aircraft operators is implicit in the statute.

The extensive enforcement scheme for § 1513 also demonstrates that Congress did not intend to create a private right of action. *See Transamerica*, 444 U.S. at 19–20, 100 S.Ct. at 246–47. Because the Anti-Head-Tax Act was enacted as an amendment to the Federal Aviation Act, most of the general enforcement provisions for violations of the Federal Aviation Act are available for § 1513. Interface can file a complaint with the Secretary of Transportation or the Civil Aeronautics Board if it believes that Massport has done or omitted to do something in contravention of § 1513, and both the Secretary and the Board have the authority, if they find that there has been a violation, to order Massport to comply with the statute. 49 U.S.C. § 1482(a) and (c). Any such order would be subject to review by the Court of Appeals for the First Circuit. 49 U.S.C. § 1486(a). The Secretary and the Board can apply to the District Court for enforcement of their orders. 49 U.S.C. § 1487(a). Moreover, Congress provided that criminal penalties are available for violations of § 1513. *See* 49 U.S.C. § 1472(a). Since Congress has made these remedies available to Interface for violations of § 1513, this court is "chary of reading other[ ] [remedies] into it." *Transamerica*, 444 U.S. at 19, 100 S.Ct. at 247.

Because § 1513 by its terms bestows no private rights on a class of which Interface is a member, and an examination of the legislative history does not reveal that Congress intended to create a private remedy under the statute, it is clear that in enacting § 1513 Congress did not intend to confer a private right of action on aircraft operators. Accordingly, the Court need not go any further in its *Cort* analysis.

*Touche Ross*, 442 U.S. at 575–576, 99 S.Ct. at 2488–89. Nevertheless, the Court notes, with respect to factor three of the *Cort* test, that finding an implied remedy on behalf of aircraft operators under § 1513 is not necessary to effectuate the purposes of the statute. The enforcement scheme discussed above appears to be an adequate means to effectuate the legislative purpose of removing the burden of local taxes on air transportation. Because Interface does not have a private right of action under § 1513, it is unnecessary to consider Massport's contention that the complaint does not sufficiently allege a violation of that section.

■ Finally, in Count VII of the complaint Interface alleges a violation of the Airport and Airway Improvement Act of 1982, 49 U.S.C. § 2210(a), which provides in relevant part:

As a condition precedent to approval of an airport development project contained in a project grant application ... the Secretary (of Transportation) shall receive assurances ... that—

(1) the airport to which the project relates will be available for public use on fair and reasonable terms and without unjust discrimination, including the requirement that (A) each air carrier using such airport (whether as a tenant, nontenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rates, fees, rentals, and other charges and such nondiscriminatory and substantially comparable rules, regulations, and conditions as are applicable to all such air carriers which make similar use of such airport and which utilize similar facilities, subject to reasonable classifications such as tenants or nontenants, and combined passenger and cargo flights or all cargo flights, and such classification or status as tenant shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on tenant air carriers ... and (C) each air carrier using such airport shall have the right to service itself or to use any fixed-base operator that is authorized by the airport or permitted by the airport to serve any air carrier at such airport....

There is no express grant of a private right of action under § 2210(a); therefore, the Court once again must determine whether Congress "intended to create, either expressly or by implication, a private cause of action." *Touche Ross*, 442 U.S. at 575, 99 S.Ct. at 2489. Although the express language of the statute and its legislative history manifests a Congressional intent to benefit air carriers such as Interface, for the reasons discussed below, I rule that Congress did not intend to create a private cause of action for air carriers under § 2210(a).

Section 2210(a) is the successor to a 1976 amendment of the Airport and Airway Development Act (the "AADA"), 49 U.S.C. §§ 1701 *et seq*. The purpose of the AADA was "to provide for the expansion and improvement of the Nation's airport and airway system" through "the imposition and application of airport and airway user charges." H.Rep. No. 91–601, 1970 U.S. Code Cong. & Ad.News 3047. In 1976, the AADA was amended to include, *inter alia*, the predecessor provision to § 2210. *See* 49 U.S.C. § 1718. In 1982, § 1718 was repealed with the passing of the Airport and Airway Improvement Act of 1982 (the "AAIA"), which included § 2210. The "Declaration of Policy" at the beginning of the AAIA provides:

The Congress hereby finds and declares that—

(1) the safe operation of the airport and airway system will continue to be the highest aviation priority;

(2) the continuation of the airport and airway improvement programs ... are required to meet the current and projected growth of aviation and the requirements of interstate commerce, the Postal Service, and the national defense ...

49 U.S.C. § 2201(a).

The AAIA for the first time made available airport development and planning funds for "privately owned reliever airports." Re-

port of the Senate Comm. on Fin. on H.R. 4961, 97th Cong., 2d Sess. (1982). This change, the legislative history reveals, was made because reliever airports serve a *"public purpose* and, in some cases, their improvement may be in the *national interest." Id.* (emphasis added).

Turning to the first factor of the *Cort* test, Interface maintains it is "one of the class for whose especial benefit ... [§ 2210(a) ] was enacted." *Cort,* 422 U.S. at 78, 95 S.Ct. at 2088. The reference in § 2210(a) does expressly identify air carriers, and it is clear that by enacting § 2210(a) Congress intended to benefit air carriers. That air carriers were *a* class Congress intended to benefit in enacting § 2210(a) or its predecessor statute does not, however, compel the conclusion that Congress intended air carriers to be the "primary" beneficiaries. *Cohen,* 647 F.2d at 212. The intended beneficiaries of the AAIA, including § 2210(a), were the users of the national air transportation system, i.e., the general public. *See Arrow Airways, Inc. v. Dade County,* 749 F.2d 1489, 1491 (11th Cir.1985) (affirmed dismissal of case brought by private airline relying on *Cort* analysis in *Hill Aircraft* and absence of evidence of intent in legislative history to § 2210 to create private remedy.); *Hill Aircraft,* 561 F.Supp. at 672 (no private right of action under predecessor to § 2210(a) principally because general public was intended beneficiary). Moreover, what the plain language of § 2210(a) does make clear is that the statute was written as a "ban on discriminatory conduct by recipients of federal funds," which the Supreme Court has said provides "far less reason to infer a private remedy." *Cannon,* 441 U.S. at 690–693, 99 S.Ct. at 1955.

Turning to the second *Cort* factor, there is nothing in the legislative history to § 2210 or its predecessor statute to indicate, explicitly or implicitly, that Congress intended to create or deny a private right of action on behalf of air carriers. The legislative history to the predecessor of § 2210 simply states that the statute would require sponsors in making decisions "to consult with air carriers and fixed-base op-

erators using the airport" and "recognizes the legitimate interest of air carriers and fixed-base operators in development at airports." H.Rep. No. 94–594, 1976 U.S.Code Cong. & Ad.News 1600, 1614. While this language shows that Congress realized the importance to airport development of advice from air carriers and fixed-base operators, and the concomitant interest of the air carriers and fixed-base operators themselves in airport development, it does not show that Congress intended to create a private right of action on behalf of air carriers or fixed-base operators.

Lastly, with respect to the third *Cort* factor, it is not necessary to effectuate the purpose of the AAIA or § 2210(a), funding airport development, to find an implied remedy because, as recognized in *Hill Aircraft,* "viewing the aviation statutes in their entirety, these enactments do comprise an intricate and comprehensive regulatory and enforcement scheme which explicitly provide for private remedies in certain cases, *see e.g.,* 49 U.S.C. § 1487, and which the court should be reluctant to modify." *Hill Aircraft,* 561 F.Supp. at 672. For these reasons, I rule that Congress did not intend to create a private remedy on behalf of air carriers under § 2210(a) and, accordingly, this Court need not consider Massport's contention that Interface has not alleged sufficient facts to state a claim under § 2210(a).

### The State Law Claims

■ Count III of the complaint alleges violations of the Massachusetts Antitrust Act, Mass.Gen.Laws Ann. ch. 93, §§ 4 and 5. These claims are barred by virtue of Mass.Gen.Laws Ann. ch. 93, § 7, which prohibits Chapter 93 claims based upon activities that are "exempt from any of the federal antitrust laws ... other than by reason of the absence of a sufficient involvement of or impact upon interstate commerce." Since the state action doctrine exempts Massport's alleged activities from the federal antitrust laws, Massport's alleged activities cannot be the basis of a claim under the Massachusetts Antitrust

Act and, accordingly, Count III should also be dismissed.

Finally, in view of its dismissal of the Federal claims, this Court declines to exercise its discretionary pendent jurisdiction over Interface's claim in Count IV brought under Chapter 93A of the Massachusetts General Laws and, accordingly, rules that Count IV should also be dismissed. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Order accordingly.